**STOCK WEST CORPORATION,**
an Oregon corporation,
Plaintiff–Appellant,

v.

**Michael TAYLOR, Defendant–Appellee.**

No. 90–35201.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 1, 1990.

Decided Aug. 20, 1991.

Barbee B. Lyon, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for plaintiff-appellant.

Alan C. Stay, Office of the Reservation Atty., Nespelem, Wash., for defendant-appellee.

Before KOZINSKI, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We consider the limits of mandatory federal court deference to Indian tribal courts.

## I

The tortuous history of this and related litigation graces the pages of numerous case reporting systems, including the Indian Law Reporter, the collected cases of the Interior Board of Indian Appeals, the Federal Supplement, and our own Federal Reporter. What follows is a synopsis.

### A

On July 24, 1984, appellant Stock West Corporation entered into contracts with two tribal governmental corporations of the Confederated Tribes of the Colville Reservation ("Colville Tribes" or simply "Tribes"). Pursuant to the contracts, Stock West agreed to design and to supervise construction of a sawmill on the reservation and to manage the mill's operations and market its products. Appellee Michael Taylor is the Reservation Attorney for the Colville Tribes.

Under 25 U.S.C. § 81, approval by the Bureau of Indian Affairs ("BIA") is required for certain tribal agreements.[1] Taylor regarded the Stock West agreements as requiring such BIA approval. Nonetheless, the BIA determined on December 7, 1984, that the contracts did not require BIA review because the contracting tribal corporations were distinct legal entities, separate from the Tribes.

In order to finance the sawmill venture, it was necessary for the tribal corporations to obtain a bank loan. Pursuant to the terms of a loan agreement, Taylor (as counsel for the tribal corporations, who were the borrowers) prepared a letter for an Oregon banking corporation, dated July 10, 1985, in which he opined that:

> [n]o consent, approval or authorization of or registration, declaration or filing with any governmental or public body or authority is required to construct the Project or operate the Mill, or if required, such consent, approval, order or authorization has been obtained.

Included among the documents which Taylor reviewed, according to the opinion letter, was the BIA's December 7, 1984, determination that approval of the Stock West agreements was not required.

Meanwhile, construction of the sawmill, which began in 1984, continued apace. Stock West was contractually obliged to manage and supervise the sawmill's construction, and then to manage the completed sawmill as well as market its products. The mill was substantially completed by February 1986.

As is generally the rule in matters which come to this court's attention, the once-promising business relationship between the contracting parties soured. Recriminations festered. According to the tribes, Stock West did not live up to its end of the bargain. Inevitably, the disputes spilled over into the courts.

### B

In July 1986, the Colville Tribes fired the first salvo, filing suit against Stock West in the tribal court. About one year later, the tribal court ruled that it possessed subject matter jurisdiction over the dispute and personal jurisdiction over Stock West. *Confederated Tribes of the Colville Reservation v. Stock West, Inc.*, 14 Indian L.Rep.

---

1. Such contracts are those:

 made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States.

 25 U.S.C. § 81 (1988). Under this section, such a contract will be null and void unless it meets certain requirements, one of which is that it "bear[s] the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it." *Id.*

(Am. Indian Law. Training Program) 6025 (Colville Tribal Ct. Aug. 17, 1987). The following year, rebuffing Stock West's attempt to compel arbitration as provided for in the contracts, the tribal court ruled that the contracts were void for lack of BIA approval under section 81. *Confederated Tribes of the Colville Reservation v. Stock West, Inc.*, 15 Indian L.Rep. (Am. Indian Law. Training Program) 6019 (Colville Tribal Ct. May 2, 1988).[2] The matter was set for trial in the tribal court.

On April 7, 1987, before the tribal court ruled on its own jurisdiction in the Colville Tribes' suit against Stock West, Stock West filed an action against the Tribes in federal district court. Stock West sought to compel arbitration under the terms of the contracts and to enjoin the tribal court action. The district court dismissed the action, citing the principle of comity and recognizing the tribal court's concurrent jurisdiction. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 14 Indian L.Rep. (Am. Indian Law. Training Program) 3097 (E.D.Wash. Aug. 5, 1987) (order of dismissal).

That decision was affirmed in a published opinion issued by this court on April 20, 1989. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221 (9th Cir.1989) (*"Stock West I"*). As had the district court, we concluded that federal courts had diversity jurisdiction over the matter, *see* 28 U.S.C. § 1332 (1988). *Stock West I*, 873 F.2d at 1226–27. We also agreed that it was appropriate for the district court to defer to the tribal court on the basis of comity. *Id.* at 1229–30.

### C

Following the foregoing, somewhat bewildering array of litigation, Stock West filed the present lawsuit. On September 8, 1989, Stock West brought this action against Taylor for malpractice and misrepresentation arising out of the opinion letter which Taylor prepared for the bank. Stock West contends that the letter was a misrepresentation because it later turned out that BIA approval of the contracts *was* required, and because Taylor issued the letter while harboring the belief that BIA approval was in fact required. Although the letter was not directed to Stock West, Stock West contends that the purported misrepresentation is actionable by Stock West as an intended beneficiary of the letter.

The district court dismissed the action. *Stock West Corp. v. Taylor*, 737 F.Supp. 601 (D.Or.1990) (*"Stock West II"*). Taylor moved for dismissal pursuant to Federal Rule of Civil Procedure 12 for lack of complete diversity, for lack of personal jurisdiction over Taylor, or as a matter of comity with the tribal courts. *Stock West II*, 737 F.Supp. at 603. As to the malpractice claim, Taylor moved for Rule 12 dismissal on the ground that Stock West had not stated a claim because of lack of attorney-client privity, or for summary judgment because Stock West's interpretation of the opinion letter was unreasonable and the case law interpreting 25 U.S.C. § 81 was unsettled. *Id.* Taylor also moved for Rule 12 dismissal or summary judgment on the misrepresentation claim because Stock West could not prove the required elements. *Id.* Additionally, Taylor requested dismissal under Federal Rule of Civil Procedure 19 because the Colville Tribes and the tribal corporations were indispensable parties which could not be joined due to the Tribes' sovereign immunity. *Id.* In connection with this last point, Taylor argued that he enjoyed official immunity from suit himself as the chief legal officer of the Tribes. *Id.*

---

**2.** Stock West has twice attempted to obtain retroactive BIA approval of the contracts. The first such attempt was made in June 1987, and was denied by the BIA on July 21, 1987. Stock West did not appeal. After the tribal court ruled that the contracts were void, however, Stock West again attempted to obtain approval. When the request was denied, Stock West appealed to the Interior Board of Indian Appeals. The appeal was rejected on the ground of timeliness, since Stock West had failed to appeal the original and 1987 refusals to grant approval. *Stock West, Inc. v. Portland Area Director, Bureau of Indian Affairs*, No. IBIA 89–26–A, 18 IBIA 7 (Oct. 5, 1989).

From this potpourri of challenges, the district court selected two on which to base the dismissal. Finding this matter as suitable for tribal court resolution as Stock West's earlier district court action against the Tribes themselves, *see id.* at 604, the district court concluded that "principles of comity require me to decline to exercise jurisdiction over the dispute until [Stock West] has exhausted its tribal court remedies." *Id.* at 605 (citations omitted). As an alternative basis for the decision, the court found that Taylor was an officer of the Colville Tribes under tribal law and that Taylor's drafting of the opinion letter was performed within the scope of Taylor's official authority, thus leading to the conclusion that Taylor was immune from suit under Colville tribal law. *Id.*

Stock West appeals the entry of judgment dismissing its action. We have jurisdiction over this timely appeal under 28 U.S.C. § 1291.

## II

We turn to the first reason given by the district court for dismissing the action: comity. The district court, having concluded that this matter arose on the reservation and was a concern of the Tribes, essentially considered itself bound to defer to the tribal courts. *See Stock West II,* 737 F.Supp. at 605. We examine when deference is due, and then consider whether this case falls within those categories for which deference is required.

### A

Indian tribes enjoy continued, if somewhat clipped, recognition of sovereignty stemming from their status as the aboriginal people of this continent. *See Native Village of Venetie I.R.A. Council v. Alaska,* 918 F.2d 797, 805 (9th Cir.1990). "Indian tribes consistently have been recognized ... as 'distinct, independent political com-

munities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty." F. Cohen, *Handbook of Federal Indian Law* 232 (1982 ed.) (quoting *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)); *see, e.g., Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 478 (9th Cir.1985) (power to exclude persons from the reservation is permissible for self-government and territorial management).

The tribal courts play a vital role in tribal self-government. *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 14–15, 107 S.Ct. 971, 975–76, 94 L.Ed.2d 10 (1987). While tribal courts are not permitted to exert criminal jurisdiction over non-Indians, *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), or even non-member Indians, *Duro v. Reina,* —— U.S. ——, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), they enjoy fairly broad powers in the civil context. *See id.* 110 S.Ct. at 2061. "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty," and thus "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts." *LaPlante,* 480 U.S. at 18, 107 S.Ct. at 977 (citations omitted); *Wellman v. Chevron U.S.A., Inc.,* 815 F.2d 577, 578 (9th Cir. 1987); *see also FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1314–15 (9th Cir. 1990) (describing and applying test for determining when tribal court civil jurisdiction is appropriate over non-Indians engaging in on-reservation activities), *cert. denied,* —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *Sanders v. Robinson,* 864 F.2d 630, 632–33 (9th Cir.1988) (considering whether tribal court may adjudicate divorce between a member and a non-Indian), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3165, 104 L.Ed.2d 1028 (1989).[3]

Because of the significance of the role of tribal courts in preserving sover-

---

**3.** A tribe's civil authority "typically involves situations arising from property ownership within the reservation or 'consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'" *Duro,* 110 S.Ct. at 2061 (quoting *Mon-*

*tana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981)). As is discussed more fully below, however, we need not attempt to discern the outer limits of tribal court jurisdiction in this matter.

eignty, the Supreme Court and this court have been protective of tribal court jurisdiction. It is often stated that tribal courts should consider the issue of their own jurisdiction first, with federal court actions to be dismissed or stayed pending exhaustion of tribal court remedies. *E.g., National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985). This exhaustion requirement, then, serves to ensure that the tribal court may protect its own jurisdiction, thereby promoting the tribe's "authority over reservation affairs" and preventing infringement upon tribal law-making authority. *See LaPlante*, 480 U.S. at 16, 107 S.Ct. at 976.

Since the Supreme Court decided *National Farmers Union* and *LaPlante*, the reported cases have been virtually unanimous in expressing the exhaustion requirement in mandatory terms. *See, e.g., Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245–46 (9th Cir.1991); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1078 n. 3 (9th Cir.1990); *Sanders*, 864 F.2d at 631 n. 1; *Wellman*, 815 F.2d at 578–79; *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1417 (9th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986); *accord Brown v. Washoe Housing Auth.*, 835 F.2d 1327, 1328 (10th Cir.1988); *Superior Oil Co. v. United States*, 798 F.2d 1324, 1328–29 (10th Cir.1986); *Tillett v. Hodel*, 730 F.Supp. 381, 384 (W.D.Okla.1990).[4] Each of these cases, however, involved a dispute which arose on a reservation and/or involved tribal governmental matters. Each case featured Indians as parties. In such circumstances, given the strong interest in tribal self-government and self-determination, it is not surprising that a federal court must defer to the tribal courts.

■ Notwithstanding the stringent language of *National Farmers Union* and *LaPlante*, and of the cases which have

followed them, the exhaustion requirement cannot be absolute whenever tribal court jurisdiction is asserted. Where the civil action involves non-Indian parties, concerns incidents which occurred off of the reservation, and will not impact the tribe's authority, there is little reason to require that the tribal court have first crack at the case. A federal court's decision to defer to the tribal courts does not come without costs, because the party that chose to pursue its cause of action in federal court is deprived of an adjudication by the forum of choice unless the tribal court has no jurisdiction. *See LaPlante*, 480 U.S. at 19, 107 S.Ct. at 978 ("proper deference to the tribal court system precludes relitigation of issues ... resolved in the Tribal Courts"). Where the tribe has little or no interest in the matter, there is no justification for imposing this cost upon the litigant.

In *Myrick v. Devils Lake Sioux Manufacturing Corporation*, 718 F.Supp. 753 (D.N.D.1989), an Indian residing on a reservation brought suit for age and race discrimination against a corporation of which the tribe was the majority owner. After canvassing the Eighth Circuit cases which had invoked *National Farmers Union* and *LaPlante* to require exhaustion of tribal remedies, the court observed that in both Supreme Court cases, tribal jurisdiction was at issue because there were ongoing tribal court proceedings which a party had sought to avoid by filing a federal court action. 718 F.Supp. at 754–55. While the Eighth Circuit cases did not involve competing actions in different courts, they did involve tribal housing authorities as parties and contract disputes arising on the reservation. *Id.* Based upon these observations, the court distinguished the case before it:

Both of the Supreme Court cases and both of the court of appeals cases discussed above involved issues of particular application and importance to the tribes themselves. In [*LaPlante*] and *National Farmers Union*, the scope of

---

**4.** *But see Blue Legs v. United States Bureau of Indian Affairs*, 867 F.2d 1094, 1097–98 (8th Cir. 1989) (exhaustion of tribal remedies not required for disputes under the Resource Conservation and Recovery Act of 1976).

tribal court jurisdiction was at issue. In [the two appeals court cases], the defendants were agencies created by the tribes and the issues presented were primarily intra-tribal. Consequently, to advance the purpose of promoting tribal self-government and self-determination, the court held that the cases should be first heard in tribal court.

*Id.* at 755. Concluding that the case before it did not involve these issues, and predominantly presented issues of federal law, the court declined to dismiss the action. *See also United States ex rel. Kishell v. Turtle Mountain Housing Auth.,* 816 F.2d 1273, 1276 (8th Cir.1987) (affirming district court's decision to dismiss, but looking to the facts of the case and noting that the case presented "a purely internal tribal controversy which the tribal court is uniquely situated to resolve").

■ We agree with these cases to the extent that they countenance an examination of the circumstances of the action before a decision to defer is made. In many cases, as in *Stock West I* itself, the issue in dispute is truly a "reservation affair" or "arose on the reservation," and thus the federal court has no option but to defer. Nonetheless, a federal court must examine the circumstances of the individual case in order to determine if deference is necessary, in light of the purposes of the exhaustion requirement. *See, e.g., Burlington Northern v. Crow Tribe Council,* 940 F.2d at 1245–46 (examining whether exhaustion must be mandatory by considering tribal self-government concerns, judicial efficiency, and the tribal court's expertise in interpreting novel areas of tribal law).

### B

The district court in the case at hand deferred to the tribal court because, in its view, the dispute between Stock West and

Taylor arose on the reservation and concerned tribal resources. The district court likened this case to the situation presented in Stock West's lawsuit against the Tribes. The district court found that

the subject matter of this action, an opinion letter drafted by the Colville Reservation Attorney on the Reservation and directed to a bank for the purpose of obtaining financing on behalf of tribal corporate entities, is directly related to the heart of tribal concerns over use and commercial realization of its economic base.... Plaintiff's claims are based on actions which took place on the Reservation involving the drafting of the opinion letter.

*Stock West II,* 737 F.Supp. at 604 (internal quotation omitted). According to the court, tribal court jurisdiction would lie where Taylor "drafted the opinion letter in his capacity as Reservation Attorney and ... the subject matter of the letter involves tribal concerns," and thus deference was necessary. *Id.* at 604–05.

We disagree with the conclusion that this action could be considered to "arise[ ] out of the reservation," *Stock West I,* 873 F.2d at 1228, or to be a "reservation affair," *LaPlante,* 480 U.S. at 16, 107 S.Ct. at 976. None of the parties to this suit are Indians. Taylor, although Reservation Attorney, was offering his legal opinion to a non-Indian third party, and breached his duty, if at all, to a non-Indian third party. The (purportedly) tortious act, the misrepresentation, was made off the reservation, upon delivery of the document in Oregon.[5]

The cases which have found disputes to have "arisen" out of the reservation differ markedly from Stock West's action against Taylor. The natural comparison is with the earlier lawsuits between Stock West and the Colville Tribes, which arose in the same context as the present matter. In *Stock West I,* on one side of the dispute were the

---

**5.** The fact that the letter may have been drafted on the reservation is of little consequence. The injury occurs not when the misrepresentation is *conceived,* but when it is *made* and induces detrimental reliance. *See generally Heil v. Morrison Knudsen Corp.,* 863 F.2d 546, 550 (7th Cir.1988) ("[A] tort is not wrongful conduct in the air; the arrow must hit its mark.... Until there is hurt, there is no tort.") (citation omitted); *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir.1986) ("The place of injury is the place where the injury was suffered, not where the wrongful act took place.").

Indian tribe itself and tribal governmental corporations. The Tribes contended that Stock West had failed to perform its contractual duties on the reservation, in connection with the construction of a sawmill on the reservation. The Tribes' tribal court action against Stock West, and Stock West's subsequent district court action against the Tribes, were entirely premised on acts and omissions occurring on the reservation, involving contracts which were to be performed on the reservation and would directly concern "tribal resources." *See* 873 F.2d at 1228. The decision on the merits of the *Stock West I* case would have a direct impact on the Tribes' future economic activity and its relationship with the Stock West Corporation.

In contrast to the situation presented in *Stock West I*, here we have a private dispute between non-Indian parties. The alleged misrepresentation was made off of the reservation, in an attempt to influence the decision-making of off-reservation businesses. Tribal resources are in no way at stake in this litigation; indeed, the Tribes have no direct interest in whether Taylor is or is not liable for making a misrepresentation to the bank and Stock West.[6] While both suits share the sawmill contracts as a background, Stock West's action against Taylor does not implicate the performance of the contracts or any on-reservation activity.

A survey of the other cases which have involved reservation affairs demonstrates that this dispute differs in significant particulars. For example, in *Wellman*, an Indian brought a breach of contract suit against a non-Indian corporation (Chevron U.S.A.) which held an oil and gas lease for drilling operations on the reservation. Wellman sued after Chevron terminated its contract with Wellman under which Wellman would build an access road to an exploratory well on the reservation. 815 F.2d at 578. As in *Stock West I*, the suit direct-

ly implicated tribal interests on the reservation, both because an Indian was a party (individually and on behalf of his on-reservation business) and because the outcome of the suit would impact economic activity on the reservation by determining whether the reservation road would be built, who would build it, and the force of the oil and gas lease's stated preference for Indian contractors. *See id.; see also Burlington Northern v. Crow Tribe Council*, 940 F.2d at 1245–46 (railroad's challenge to tribal ordinance establishing regulatory commission to oversee railroad activities on the reservation); *A & A Concrete*, 781 F.2d at 1416 (multi-count action against tribe and individual Indians arose out of contract dispute for on-reservation construction project and subsequent tribal court judgment and execution of judgment).

In the Supreme Court decisions in this area, *National Farmers Union* and *LaPlante*, insurance companies sued Indians (and in one case, the tribe itself) in federal court following the institution of tribal court lawsuits against the insurers. In both cases, the underlying dispute was an automobile accident on the reservation, and the liability of the contesting insurance companies or their insureds for the injuries (and, in *LaPlante*, for the insurer's own conduct in adjusting the claim). *See LaPlante*, 480 U.S. at 11–13, 107 S.Ct. at 973–75; *National Farmers Union*, 471 U.S. at 847–49, 105 S.Ct. at 2449–50. Such disputes clearly "arise" on the reservation, given the situs of the harm on the reservation and the presence of Indian parties.

We are not unmindful of the possibility that the Colville Tribes may have an indirect interest in the outcome of this action, because of Taylor's status as Reservation Attorney and the genesis of the action in the Tribes' business relations with Stock West and outside financiers. To hold this sufficient to term the action "arising" out of the reservation, however, would be to

---

**6.** This case would have an entirely different complexion if Stock West had alleged that the Colville Tribes were in some way liable as well, perhaps for encouraging Taylor to commit the tort. However, Stock West has framed its com-

plaint so as clearly to limit the allegations to Taylor personally, arising from his misconduct as a member of the Washington State Bar in advising his clients and third parties.

"decide[ ] this case by anticipating downstream disputes that may or may not arise between" Taylor and his employer, the Tribes. *White Mountain Apache Tribe v. Smith Plumbing Co. Inc.*, 856 F.2d 1301, 1306 (9th Cir.1988) (reversing injunction against state court action instituted by subcontractor on reservation project against tribe's surety, who was likely to seek indemnification from the non-party tribe if held liable). Any arrangements made between the Tribes and Taylor with regard to this dispute "have nothing to do with" Stock West, "a stranger to the agreements between [Taylor] and the Tribe[s]." *Id.*

█ We conclude that a non-Indian's breach of an independent duty to another non-Indian, occurring off of the reservation, falls without the nebulous confines of a "reservation affair" and does not arise on the reservation. In such circumstances, we fail to see the necessity for dismissal of the federal court action. Instead, we reaffirm the principle, stated in *Wellman*, that in non-Indian matters, "non-Indians can go to district court directly." 815 F.2d at 579.

The district court based its decision to defer not on a reasoned exercise of its discretion, but on its misimpression that exhaustion of tribal remedies was mandatory in the face of possible tribal court jurisdiction. *See Stock West II*, 737 F.Supp. at 605 ("principles of comity *require* me to decline to exercise jurisdiction") (emphasis added). While we are not simply to substitute our judgment for that of the lower

court when reviewing for abuse of discretion, *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir.1988), here the district court has misinterpreted the applicable law. Our review of the record does not support dismissal. There is no pending tribal court proceeding, the principal issues presented are of state or federal law, and the tribal court possesses no special expertise in the subject matter. *See Burlington N. R.R. Co. v. Blackfeet Tribe*, 924 F.2d 899, 901 n. 2 (9th Cir.1991).[7] Comity does not suffice as a basis for affirmance under these facts.

### C

In reaching the conclusion that deference to the tribal courts was not required in this instance, we are not placing the federal courts "in direct competition with the tribal courts," *LaPlante*, 480 U.S. at 16, 107 S.Ct. at 976. The tribal courts have superior expertise in interpreting their own tribal law. *See National Farmers Union*, 471 U.S. at 855–56, 105 S.Ct. at 2453–54; *Burlington Northern v. Crow Tribe Council*, 940 F.2d at 1246–47. In addressing the question before this court, however, we have not resorted to an examination of tribal law; for example, we have not considered the possible reach of the Colville Tribes' jurisdictional statute, Colville Law & Order Code § 1.3.01. We render no opinion as to the scope of the Colville Tribes' tribal court jurisdiction, or whether the dispute between Stock West and Taylor might fall within the parameters of that jurisdiction.[8]

---

7. *Burlington Northern v. Blackfeet Tribe* is something of an anomaly. In a footnote, the court upheld the district court's rejection of the tribe's argument that the action should be dismissed for failure to exhaust tribal remedies. *See* 924 F.2d at 901 n. 2. However, the dispute meets any definition of "reservation affair": it involved a direct action against a tribe and tribal officials, inspired by the tribe's imposition of a tax upon a right-of-way over the reservation occupied by the railroad. *See id.* at 900–01. The court's result may be explained by the facts that the tribes failed to cross-appeal this issue, *see id.* at 901 n. 2, and, because the court held for the tribe on the merits, it was not necessary to examine the tribe's other contentions in much detail. Certainly, the court did not consider the specific question of whether the dis-

pute before it arose on the reservation or otherwise qualified as a reservation affair.

8. In *Stock West I,* the court stated that "[b]y deferring to the tribal court proceedings because of comity, the district court was essentially ruling that the tribal court has jurisdiction to hear the case." 873 F.2d at 1227. This is something of an overstatement. A decision to defer reflects the federal court's conclusion that tribal court jurisdiction is at least a possibility, and that under the circumstances the case should appropriately be heard in the tribal courts if within their jurisdiction. As we later observed, "the federal courts should not even make a ruling on tribal court jurisdiction ... until tribal remedies are exhausted." *Id.* at 1228; *see also Burlington Northern v. Crow Tribe Council,* 940 F.2d at 1244 (quoting this portion of *Stock*

Nor do we hold that this case falls within one of the exceptions to the exhaustion requirement recounted in *National Farmers Union* and *LaPlante*. *See LaPlante*, 480 U.S. at 19 n. 12, 107 S.Ct. at 978 n. 12; *National Farmers Union*, 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21. We have not concluded that Taylor's assertion of concurrent tribal court jurisdiction is motivated by a desire to harass, is "patently violative of express jurisdictional prohibitions," or that exhaustion would be futile. *Id.* Rather, we conclude that it is not necessary to satisfy one of these exceptions when the dispute is not a reservation affair and does not arise on the reservation. In this case, therefore, the federal court was free to exercise its concurrent jurisdiction, and should have done so.

### III

■ The district court also found that Taylor was entitled to dismissal because he is immune from suit as an official of the Colville Tribes. If borne out, the assertion of official immunity, as a corollary to the Tribes' sovereign immunity, would be sufficient to require dismissal of the action.

"Suits against Indian tribes are ... barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* — U.S. ——, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)). "This tribal immunity extends to individual tribal officials acting in their representative capacity and within the scope of their authority." *Hardin*, 779 F.2d at 479 (citing *United States v. Oregon*, 657 F.2d 1009, 1012 n. 8 (9th Cir.1981)).

The district court concluded that Taylor's alleged tortious conduct did fall within the Tribes' immunity umbrella. Colville Law & Order Code § 1.1.06 provides that the

*West I*). Our examination of the question of tribal court jurisdiction was clearly labelled as dicta. *See Stock West I*, 873 F.2d at 1228 ("As-

Tribes' "officers and employees" are immune from suit "for any liability arising from the performance of their official duties." The court regarded Taylor's position, senior attorney in the Office of the Reservation Attorney and chief legal official for the Colville Tribes, as rendering Taylor an officer of the Tribes. 737 F.Supp. at 605. The court also concluded that the drafting of the opinion letter was an act performed within the scope of Taylor's official authority. *Id.*

We need not determine whether Taylor's position as Reservation Attorney qualifies him for "tribal official" immunity in the usual performance of his duties, because we conclude that the district court was premature in granting immunity status in this case. Taylor's argument that his position with the Colville Tribes is analogous to a state attorney general has at least surface appeal. However, even conceding the analogy, we cannot say on the record before us whether Taylor was acting within his representative capacity, and whether he was within the scope of his delegated authority. *See Hardin*, 779 F.2d at 479–80; *see also Burlington Northern v. Blackfeet Tribe*, 924 F.2d at 902.

Taylor principally relies on three cases to support the claim of official immunity; none is persuasive. In *Davis v. Littell*, 398 F.2d 83 (9th Cir.1968), *cert. denied*, 393 U.S. 1018, 89 S.Ct. 621, 21 L.Ed.2d 562 (1969), a tribe's general counsel was immunized from suit for purportedly slanderous remarks made to the tribal council concerning the abilities of counsel's assistant. The counsel in this case plainly was acting in his representative capacity and within the scope of his authority. The counsel was advising the tribal council, which was his job, about the merits (or lack thereof) of a council hiree and subordinate, which was also his business. *See id.* at 85. Without immunity, the counsel would have been hindered in performing his functions for the tribal government.

suming, arguendo, that the federal courts could decide the tribal jurisdiction question, the tribal courts have jurisdiction to hear this case...").

In *Hardin*, the tribe, its court, its council, and various officials were held immune from suit brought by a disgruntled non-Indian reservation resident. The dispute stemmed from the Indian defendants' expulsion of the resident after the resident's conviction for concealing stolen federal property. Such action obviously fell within the Indians' official duties; in fact it was the official action of expulsion of which the resident complained. 779 F.2d at 478; *see id.* at 479–80 (resolving the issue of official immunity in three sentences). *Native Village of Tyonek v. Puckett*, 890 F.2d 1054 (9th Cir.1989), *vacated and remanded*, —— U.S. ——, 111 S.Ct. 1097, 113 L.Ed.2d 208 (1991), is inapposite for the same reason.

In *Davis*, *Hardin*, and *Puckett*, claims were asserted against tribal officials for actions clearly tied to their roles in the internal governance of the tribe. None of these cases even involved dealings with (off-reservation) third parties on behalf of the tribe, much less dealings with a non-Indian third party as a member of the state bar and representative of a borrower.

It is clear that tribe members, including officials, are amenable to suit if the subject of the suit is not related to the officials' performance of official duties. In *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), the Supreme Court permitted a state court "to adjudicate the rights of the individual defendants" relating to fishing rights. *Id.* at 173, 97 S.Ct. at 2621. Those defendants, including tribal officials, *see id.* at 168 & n. 3, 97 S.Ct. at 2619 & n. 3, had been acting as fishermen rather than tribe governmental officers when engaging in the complained-of activities.

Stock West's allegation in this case is that Taylor was acting as an attorney, rather than as a tribal official, and owed duties to the bar and to interested third parties to issue a letter reflecting his best legal judgment. This presents a closer question than *Puyallup Tribe*, because it appears that Taylor's issuance of the letter was a portion of his "job responsibilities," at least as broadly construed. However, it is not clear that Taylor's role as counsel to the tribal corporations party to the sawmill contracts is necessarily a function of Taylor's role as a possible "tribal official." *Cf. Evans v. McKay*, 869 F.2d 1341, 1348 n. 9 (9th Cir. 1989) (tribal officials are not cloaked in immunity from federal civil rights suit to the extent they acted in concert with police officers, who in turn were acting under color of state law).

The district court did not permit Stock West to pursue detailed discovery into the nature of Taylor's duties, whether those duties qualify him as a tribal official, and any connection between Taylor's "official" duties and the opinion letter. There is also the possibility that Taylor would not be deserving of immunity under tribal law if the delivery of a legal opinion to which he did not subscribe could be considered "egregious." *See Stone v. Somday*, 10 Indian L.Rep. (Am.Indian Law.Training Program) 6040, 6041 (Colville Tribal Ct. 1983). We think that Stock West is entitled to explore those issues before summary judgment on immunity is appropriate.[9]

## IV

■ Although we are not persuaded by either of the district court's reasons for dismissal of Stock West's action, we do not end our inquiry here. It is a familiar tenet of our appellate jurisdiction that "[w]e may affirm the district court on any ground supported by the record, even if the district

---

**9.** Our dissenting colleague suggests that any doubt concerning Taylor's status as an officer of the tribe argues for deferral to the tribal courts. *Post* at 668 n. 1. In this action Taylor is at risk under state law for his alleged breach of an independent duty to off-reservation non-Indians. We have never found the mere assertion of tribal immunity to be sufficient cause to defer to tribal courts, and we do not believe the bare allegation may transform this suit into a

"reservation affair." Federal courts have often assessed the possible applicability of tribal immunity without the aid of the tribal courts. *See, e.g., Oklahoma Tax Comm'n*, 111 S.Ct. at 910 (immunity of tribe itself); *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269 (9th Cir.1991) (tribe and tribal officers); *Evans*, 869 F.2d at 1349 n. 9 (tribal officers); *Hardin*, 779 F.2d at 478–80 (tribe and officers).

court relied on different reasons." *Big Spring v. United States Bureau of Indian Affairs,* 767 F.2d 614, 616 (9th Cir.1985), *cert. denied,* 476 U.S. 1181, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986). Taylor offers numerous arguments which, if supported, would provide the necessary basis for affirmance.

**A**

◼◼ Taylor argues that Stock West's complaint fails to state a claim for legal malpractice under Oregon or Washington law.[10] *See* Fed.R.Civ.P. 12(b)(6). Negligent legal malpractice requires proof of duty, breach, proximate cause, and damage. *Harding v. Bell,* 265 Or. 202, 204, 508 P.2d 216, 217 (1973); *Stangland v. Brock,* 109 Wash.2d 675, 679, 747 P.2d 464, 467 (1987). Stock West's allegations in its complaint that Taylor "failed to exercise reasonable care in reaching an opinion that the contracts were enforceable," that Taylor intended to induce Stock West's reliance, and that Stock West did rely to its detriment on the opinion were sufficient to set out the required elements.

Taylor argues, however, that Stock West's allegations are deficient because it has not alleged that it was Taylor's client, or that it was a party to the loan transaction, or even that it was an addressee of the opinion letter. Essentially, Taylor's argument is that he had no duty to Stock West.

◼◼ A few scattered authorities from Oregon and Washington courts have recognized that a malpractice plaintiff need not be a client of the attorney, so long as the plaintiff is an intended beneficiary of the attorney's undertaking. *See, e.g., Hale v. Groce,* 304 Or. 281, 284–87, 744 P.2d 1289, 1290–92 (1987) (will-drafting context); *Lee v. Nash,* 65 Or.App. 538, 543–45, 671 P.2d 703, 706–07 (1983) (en banc) (unauthorized disclosures by husband's bankruptcy attorney actionable by wife), *review denied,* 296 Or. 253, 675 P.2d 491 (1984); *Stangland,* 109 Wash.2d at 679–83, 747 P.2d at 467–68 (will-drafting context).[11] Stock West argues that it was the intended beneficiary of Taylor's opinion letter, albeit not the letter's named addressee. Although the issue is one of first impression for Oregon and Washington, in other jurisdictions, attorneys have been held liable to non-clients for their negligent issuance of opinion letters. *See* 1 R. Mallen & J. Smith, *Legal Malpractice* §§ 7.10–.11, at 381, 389 (3d ed. 1989); *see also* Annotation, *What Constitutes Negligence Sufficient to Render Attorney Liable to Person Other Than Immediate Client,* 61 A.L.R.4th 464, § 39 (1988 & Supp.1990). Without resolving the factual question of whether Stock West was an intended beneficiary, we conclude that the allegation of a duty is sufficient to survive Rule 12(b).

Taylor also contends that, under the established facts of this case, Stock West will not be able to establish either its malpractice or misrepresentation claims as a matter of law. *See* Fed.R.Civ.P. 56(c). The district court specifically noted that further discovery would be necessary before summary judgment were appropriate. We agree. Taylor's arguments regarding the "unreasonableness" of Stock West's reliance upon the opinion letter should be addressed to the trier of fact. Taylor's assertions that the law regarding section 81 was unsettled at the time of the letter, or that Taylor's representations were "true when made," do not rebut the heart of Stock West's contention: that Taylor issued an opinion letter which did not in fact express his reasoned legal judgment, har-

---

**10.** As neither party has briefed the issue nor requested our insight, we will not resolve the choice of law question at this point.

**11.** Expanding attorney malpractice liability to non-clients is clearly the trend. 1 R. Mallen & J. Smith, *Legal Malpractice* § 7.10, at 379 (3d ed. 1989); *see also Harad v. Aetna Cas. & Sur. Co.,* 839 F.2d 979, 983 n. 5 (3d Cir.1988) (surveying attorney liability to third parties); Model Rules of Professional Conduct Rule 2.3 comment (1989) ("When the evaluation is intended for the information or use of a third person, a legal duty to that person may or may not arise."); G. Hazard & W. Hodes, *The Law of Lawyering* § 2.3:102 (2d ed. 1990) (discussing model rules); C. Wolfram, *Modern Legal Ethics* § 13.4.4, at 709 (1986) (suggesting growing liability for opinion letters, at least in securities law).

boring a "secret intent" to induce involvement in the sawmill plan.

## B

We briefly address the other arguments raised by Taylor as alternate grounds to affirm the entry of judgment against Stock West. Taylor attempts to invoke the Tribes' sovereign immunity in two different ways, and also asserts other defects in the district court's jurisdiction.

First, Taylor characterizes this suit as a veiled attempt to affect the Tribes' tribal court litigation against Stock West. The record does not support the contention unambiguously, and we are in no position to evaluate the conflicting evidence offered by Taylor and Stock West's counsel.

 Second, Taylor asserts that the Colville Tribes and the tribal corporations for whom he wrote the opinion letter are indispensable parties. *See* Fed.R.Civ.P. 19. *See generally Confederated Tribes v. Lujan,* 928 F.2d 1496 (9th Cir.1991) (detailed discussion of Rule 19's strictures presented in two opinions). Frankly, we are at a loss to understand how these entities could be prejudiced by a finding of Taylor's personal liability for tort damages to Stock West, a third party to whom he purportedly owed an independent duty. Any conclusion that the opinion letter contained misrepresentations could not preclude the tribal corporations' relitigation of that issue in a subsequent proceeding with the bank, because the corporations have no direct interest in Taylor's malpractice and thus Taylor could not be considered their "virtual representative," *A & A Concrete,* 781 F.2d at 1417–18.

Third, Taylor challenges the court's diversity jurisdiction, arguing that he is a resident of Washington state, and that Stock West's principal place of business was in Washington. *See Industrial Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090, 1094 (9th Cir.1990) (principal place of business is state in which most of corporation's business activities take place). Stock West's citizenship is at best a disputed issue, which the district court expressly refused to resolve at this time. Neither will we.[12]

 Finally, Taylor asserts that there was no basis for the United States District Court for the District of Oregon's exertion of personal jurisdiction over him. Oregon's long-arm statute, Or.R.Civ.P. 4L, would permit jurisdiction if (1) Taylor purposely availed himself of the privilege of conducting activities in Oregon, (2) the claim arises out of Taylor's activities in Oregon, and (3) the exercise of jurisdiction is reasonable. *See Data Disc, Inc. v. Systems Technology Assocs., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977). We think the facts that Taylor traveled to Oregon to induce an Oregon business to make his clients a loan, and that Taylor allegedly issued a false opinion letter to the business while in Oregon, are sufficient to bestow the Oregon courts with personal jurisdiction over Taylor for this particular action.

## V

We conclude that the district court erred in dismissing this case for failure to exhaust tribal court remedies or based on Taylor's purported immunity from suit. We also reject Taylor's additional grounds for affirming the entry of judgment against Stock West, although we recognize that further proceedings may establish the validity of some of Taylor's present contentions. Obviously, we do not attempt to predict whether future development of the record will support or undermine Taylor's assertions.

REVERSED and REMANDED.

FERNANDEZ, Circuit Judge, dissenting:

I will not extend the reports by writing at length. Most simply put, I think that

---

**12.** In another matter, we have upheld a district court's conclusion that Stock West was a citizen of Oregon for diversity purposes. *Stock West I,* 873 F.2d at 1226.

the district court was correct. *See Stock West Corp. v. Taylor,* 737 F.Supp. 601 (D.Ore.1990).

The majority's dual holding is that this is not a case for deferral to tribal court jurisdiction, nor is it a clear case of tribal officer immunity [1]. The result is that Stock West is allowed to open an entirely new front in its dispute with the tribe. It is allowed to sue a tribal officer in district court. However, Stock West's action is based upon the flimsiest of complaints about that officer's behavior toward itself. [2]

Surely that does undermine the tribe's ability to conduct its own affairs and to adjudicate its own disputes. Ultimately, as we recognize in so many other areas, governments are run by people. When we allow an attack upon those people individually we attack the operation of the government itself. [3] What we are doing here is allowing Stock West to drag its dispute with the tribe through the back door of the federal courthouse. The parties know that, the tribe knows it, the district judge knows it, we know it. So does the law. Therefore, I respectfully dissent.

---

1. The majority questions whether Taylor's actions were part of his duties for the tribe, even though he was the senior attorney for the Office of the Reservation Attorney and was busily putting together contracts for the development of tribal resources. The majority seems to express doubt about whether the tribal statutes really cover Taylor's activities and confer immunity upon him. Of course, that doubt is still another reason to defer to the tribal courts, where the construction of tribal law and determination of Taylor's true position with the tribe can be decided by those who should have the most expertise on the subject.

2. As the majority states, Taylor had thought that BIA approval of the contracts in suit here was required, but the BIA said that no approval was needed or desirable. Stock West knew that. Thereafter, Taylor, with specific citation to the BIA response, opined to someone else that approval was not required. As it turned out, his first (and perhaps continuing personal) opinion was correct. Approval really was required.

3. There are many times when that is necessary and proper. This is not one of them.