**Marion ESPIL, widow of Louis Espil; The Estate of Louis Espil, deceased; Peter Espil and Yvonne Espil, husband and wife; Espil Sheep Company, an Arizona corporation, Plaintiffs,**

v.

**Cato SELLS; Warren Pyle and Charlotte Pyle, husband and wife, Defendants.**

No. Civ. 92–1795 PCT PGR.

United States District Court,
D. Arizona,
Division One.

March 30, 1994.

---

Marvin Johnson, Phoenix, AZ, for plaintiffs.

Daniel Cracchiolo, Bryan F. Murphy, Burch & Cracchiolo, Phoenix, AZ, for defendants.

### MEMORANDUM AND ORDER

ROSENBLATT, District Judge.

### I. BACKGROUND:

■ This action was brought to enjoin the enforcement of a Navajo tribal court judgment. The plaintiffs, the defendants in the tribal court and now the judgment debtors, asserts that the Navajo courts did not and do not have subject matter jurisdiction over the controversy.

The events giving rise to the dispute began in early 1985. At that time, Louis and Peter Espil (the Espils) were the sole shareholders in the Espil Sheep company, an Arizona corporation. The company owned the Peaks

Ranch, located near the San Francisco Peaks and north of Flagstaff, Arizona. The ranch is entirely outside the boundaries of the Navajo reservation.

Prior to 1985, the Espils decided to sell the ranch. They made an offer to the Navajo Nation but received no response. Warren Pyle, an associate of the Espils, offered to introduce the Espils to Pyle's friend, Cato Sells. Sells, a member of the Navajo tribe, had previously held various positions in the Navajo government and still had contacts there. Pyle proposed to the Espils that he and Sells, in return for a fee, act as consultants on the sale of the Ranch to the Navajo Nation. None of the parties was a resident of the Navajo nation. All but Sells are non-Indian.

On February 13, 1985, Pyle and Louis Espil met with Sells at his home in Farmington, New Mexico. Sells wanted time to investigate the possibility of the sale before agreeing to help the Espils. He was particularly interested in gauging the local reaction to the water rights that came with the ranch and in the fact that the land comprised an area sacred to the Navajo people. With money given to him by Louis Espil, Sells travelled to the vicinity of Tuba City, Arizona, on the Navajo Nation and talked with local officials regarding the purchase of the Peaks Ranch by the tribe. He received a favorable response.

On March 7, 1985, Pyle brought Louis Espil to Sells' home in Farmington, New Mexico. Pyle, Sells and Louis Espil discussed the sale of the ranch to the Navajo Nation and the alleged brokerage agreement, continuing their conversation during a drive through the Navajo Agricultural Products Industry (NAPI) land in the eastern Navajo agency. NAPI is located on Navajo tribal trust land and within the boundaries of the Navajo Nation. By the conclusion of the meeting, Pyle and Sells had agreed to facilitate the sale of the Peaks Ranch in exchange for $600,000.00 if the Navajo Nation purchased it. The Navajo trial court found that the place of formation of this alleged oral agreement was outside the Navajo Nation.

Sells and Pyle were not licensed real estate brokers and apparently did not represent themselves as such. Their alleged oral agreement was never reduced to writing.

Thereafter, Louis Espil had three meetings with officials of the Navajo government related to the sale of the ranch. Sells arranged the first two meetings, and was present at the first. Pyle attended all three meetings. All the meetings took place on the Navajo reservation in offices of the Navajo Nation in Window Rock, Arizona.

In February, 1986, Louis Espil decided to sell the Peaks Ranch to another party. When Pyle discovered this, he immediately contacted Peter Espil and arranged a meeting with the then tribal chairman Peterson Zah. At the meeting, Peter Espil verbally agreed to sell the Peaks Ranch to the Navajo Nation. When Louis Espil found out about the meeting and the verbal agreement, he became angry and "fired" Pyle.

Between the two Espil brothers, they made four trips to the Navajo reservation to negotiate the land sale, one tour of NAPI land during discussions of the ranch sale and negotiations of the brokerage agreement, and various telephone calls to tribal officials. Pyle and Sells each made several trips to the Navajo Nation and elsewhere to facilitate the sale.

On August 6, 1986, the Navajo Nation bought the Peaks Ranch for over $6,000,000.00. The closing took place at the ranch and in Flagstaff, Arizona. Sells and Pyle commenced an action, in the Navajo tribal courts, after the Espils refused to pay for their services under the alleged brokerage agreement.

The Espils moved for summary judgment based on the contention that the tribal court did not have *in personam* jurisdiction over them. The Navajo trial court granted the motion. Pyle and Sells appealed the summary judgement to the Navajo Supreme Court and that court treated the summary judgment as if it were an appeal from a dismissal (i.e. The Navajo Supreme Court recognized that summary judgment is a decision on the merits and that the Navajo trial court had not reached the merits.). In an opinion that extensively discussed "minimum contacts" and the basis for assertion of *in*

*personam* jurisdiction, the Navajo Supreme Court found that it did have personal jurisdiction over the Espils. The Navajo Supreme Court then remanded the case to the Navajo trial court.

The Navajo trial court conducted a jury trial, the jury found in favor of Pyle and Sells on their breach of contract claim, and the court entered judgment. The Espils appealed the judgment to the Navajo Supreme Court but subsequently voluntarily dismissed that appeal.

■ The Espils now petition this court to enjoin the Navajo court's judgment on grounds that the Navajo courts did not have subject matter jurisdiction over the controversy.

## II. *ANALYSIS:*

### *THIS COURT WILL NOT ADDRESS THE ISSUE OF WHETHER OR NOT THE NAVAJO TRIBAL COURTS HAVE SUBJECT MATTER JURISDICTION OVER THIS CONTROVERSY UNLESS THE ESPILS EXHAUSTED THEIR TRIBAL REMEDIES OR UNLESS THE FACTS OF THIS CASE IMPLICATE ONE OF THE EXPRESS EXCEPTIONS TO THE EXHAUSTION RULE.[1]*

The Supreme Court has repeatedly recognized the federal government's longstanding policy of encouraging tribal self-government. *See e.g., Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 138 n. 5, 102 S.Ct. 894, 902 n. 5, 71 L.Ed.2d 21 (1982); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143–144 and n. 10, 100 S.Ct. 2578, 2583–2584 and n. 10, 65 L.Ed.2d 665 (1980); *Williams v. Lee*, 358 U.S. 217, 220–221, 79 S.Ct. 269, 270–271, 3 L.Ed.2d 251 (1959). Tribal courts play an integral role in tribal self-government and the federal government encourages their development. *See Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 15–16, 107 S.Ct. 971, 975–976, 94 L.Ed.2d 10 (1987). The Ninth Circuit, as well as the Supreme Court, has specifically affirmed the necessity of deference to tribal courts when matters of tribal importance catalyze litigation. *See e.g., Stock West Inc., v. Taylor*, 964 F.2d 912 (9th Cir.1992); *Wellman v. Chevron U.S.A. Inc.*, 815 F.2d 577 (9th Cir.1987) (dismissal affirmed even though no tribal court action pending).

■ Although tribal courts cannot maintain criminal jurisdiction over non-Indian defendants, *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), their civil jurisdiction is not similarly constrained. *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). When events occurring on a reservation give rise to a civil dispute between an Indian and a non-Indian the tribal court is presumed to maintain subject matter jurisdiction. *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 977; *Wellman*, 815 F.2d at 578. The doctrine of exhaustion has developed out of this presumption, and principles of comity demand that tribal courts be the first arbiters of the scope of their jurisdiction. *LaPlante*, 480 U.S. at 18, 107 S.Ct. at 977.

■ Although an inquiry into the scope of a tribal court's subject matter jurisdiction is a federal question, certainly proper for decision by a federal district court, *FMC v. Shoshone–Bannock Tribes*, 905 F.2d 1311, 1314 (9th Cir.1990), the federal judiciary will decline to examine such a question before a petitioner has exhausted the available tribal remedies. *LaPlante*, 480 U.S. at 16, 107 S.Ct. at 976; *National Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985). Considerations of comi-

---

1. The parties have not briefed the issue of exhaustion and Pyle and Sells have not requested that this court abstain. Nevertheless, this court has discretion to raise comity issues sua sponte. *See e.g., Smith v. Moffett*, 947 F.2d 442, 445 (10th Cir.1991) ("[W]e have discretion to raise comity issues sua sponte."); *Thomas v. Indiana*, 910 F.2d 1413, 1415 (7th Cir.1990) ("[D]elicate questions of comity can be raised on the courts own initiative."); *Brown v. Fauver*, 819 F.2d 395, 398 (3d Cir.1987) (not inappropriate for court to raise non-exhaustion issue sua sponte); *Pittsburgh & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1422 (10th Cir.1990) (declining to address issue sua sponte but not indicating court lacked discretion to do so).

ty and promotion of tribal self-government and self-determination require that tribal courts have "the first opportunity to evaluate the factual and legal bases for challenge" to its jurisdiction. *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454. Proper respect for tribal legal institutions requires that they be given a full opportunity to consider the issues before them and "to rectify any errors." *National Farmers Union,* 471 U.S. at 857, 105 S.Ct. at 2454. "At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." *LaPlante,* 480 U.S. at 17, 107 S.Ct. at 977. In the Ninth Circuit, "[t]he requirement of exhaustion of tribal remedies is not discretionary; it is mandatory." *Burlington N.R.R. Co. v. Crow Tribal Council,* 940 F.2d 1239, 1245 (9th Cir.1991).

### A. Did The Petitioner Exhaust The Available Tribal Remedies?

■ In the present case the Espils have not exhausted their tribal remedies. Exhaustion, "at a minimum, requires that tribal appellate courts be given the opportunity to review the determinations of the lower tribal courts." *LaPlante,* 480 U.S. at 17, 107 S.Ct. at 977. The Espils voluntarily dismissed their appeal to the Navajo Supreme Court after judgment on the merits was entered. Further, the record before this court indicates that the Espils did not raise the specific issue of subject matter jurisdiction at either the trial level or in the Navajo Supreme Court. The question of *in personam* jurisdiction was litigated at the trial level and the Navajo Supreme Court did engage in a detailed "minimum contacts" analysis. However, whether a court maintains power over the person, and whether the same court maintains the power to decide a case in the first instance, although related, are distinct inquiries. Friedenthal, Kane, & Miller, *Civil Procedure,* § 2.1, pp. 9–10 (West) 1985. The Navajo courts have not passed on the latter.

The Navajo Tribal Code provides:

Writs or Orders:

The Supreme Court shall have the Power to issue any writs or orders necessary and proper to the complete exercise of its jurisdiction, or to prevent or remedy any act of any Court which is beyond such Court's jurisdiction, or to cause a Court to act where such Court unlawfully fails or refuses to act within its jurisdiction.

7 N.T.C. § 303.

Writs or Orders:

The District Courts shall have the power to issue any writs or orders necessary and proper to the complete exercise of their jurisdiction.

7 N.T.C. § 255.

These sections of the Navajo Tribal Code indicate that the Espils could have raised the issue of subject matter jurisdiction at the trial level or complied with Navajo civil appellate procedure and raised the issue in the Navajo Supreme Court. The record before this court indicates that the Espils have not sought any of these tribal remedies. Therefore, unless the facts of this case implicate an express exception to the exhaustion doctrine, comity concerns mandate that this court dismiss without prejudice or hold in abeyance the Espils' complaint.[2]

### B. Do The Facts Of This Case Implicate One Of The Exceptions To The Exhaustion Rule?

■ "The Supreme Court has stated that the doctrine of abstention 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it'" *United States v. Plainbull,* 957 F.2d 724, 727 (9th Cir.1992) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)), and that "mandatory deference does not follow automatically from an assertion of tribal court jurisdiction." *Crawford v. Genuine Parts Co., Inc.,* 947 F.2d 1405, 1407 (9th Cir.1991). "[W]here an assertion of Tribal Court jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibi-

---

2. This Court has the option of dismissal or abeyance if it decides not to rule on the scope of the tribal court jurisdiction. *National Farmers Union,* 471 U.S. at 856, 105 S.Ct. at 2454.

tions, or where exhaustion would be futile because of the lack of adequate opportunity to challenge the [tribal] court's jurisdiction," exhaustion is not required. *See National Farmers Union*, 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21 (internal citations omitted).

### 1. Is The Assertion Of Tribal Court Jurisdiction Motivated By A Desire To Harass Or Is It Motivated By Bad Faith?

■ The "motivated by a desire to harass or is motivated by bad faith" exception to the exhaustion rule relates to actions of courts and not the parties. *See Juidice v. Vail*, 430 U.S. 327, 338, 97 S.Ct. 1211, 1218–1219, 51 L.Ed.2d 376 (1977) (cited in *National Farmers Union* as authority for the exception to the exhaustion doctrine); *cf. Cameron v. Johnson*, 390 U.S. 611, 619, 88 S.Ct. 1335, 1339–1340, 20 L.Ed.2d 182 (1968). There are no allegations that the Navajo tribal courts acted in bad faith or were motivated by a desire to harass the Espils. Indeed, the Navajo tribal courts have not yet specifically passed on whether or not they have subject matter jurisdiction over the controversy and such an assertion of jurisdiction will not be assumed where the parties have failed to raise the issue. This being true, that there is no assertion of subject matter jurisdiction in the first instance, it is not possible that there is some motivation to proceed in a manner implicating bad faith or harassment.

### 2. Would Exhaustion Be Futile Because Of The Lack Of Opportunity To Challenge The Tribal Court's Jurisdiction?

■ The Espils have alleged that they are without an adequate remedy at law. *See* Plaintiff's First Amended Complaint at p. 3, ¶ 11. However, the Navajo Tribal Code does provide for Navajo appellate courts to "prevent or remedy any act of any Court which is beyond such Court's jurisdiction." 7 N.T.C. § 303. Still, Navajo appellate courts will not hear issues not litigated in the lower courts, 7 N.T.C. § 803, and the thirty day limit on requests for appeals in the Navajo courts, (which the Espils have not met as a result of their voluntary dismissal), is jurisdictional. *See Window Rock Mall Ltd. v. Day IV*, 3

Nav.R. 58 (1981); *The Navajo Tribe of Indians v. Yellowhorse, Inc.*, A–CV–05–87. But, "there are exceptions to that rule [to issue writs of prohibition after a failure to timely file an appeal] where the remedy by appeal is not adequate or there may clearly be a jurisdictional defect in the judgment of the trial court." *Window Rock Mall Ltd. v. Day IV*, 3 Nav.R 58 (1981) (citing, 63 Am.Jur.2d, Prohibition §§ 7–10).

In short, the Navajo rules of civil appellate procedure and Navajo case law do not clearly indicate whether or not the Navajo Supreme Court will hear the Espils' jurisdictional challenge. If this issue is to be determinative, the considerations of comity that require exhaustion would warrant that this court not determine whether it is futile to return to the Navajo system. If the Navajo court refuses to consider the Espils' challenge, the requirements of exhaustion and the futility exception to the exhaustion rule would both be satisfied. This court would then, most certainly, be the appropriate forum for the jurisdictional challenge. *See LaPlante*, 480 U.S. at 19, 107 S.Ct. at 978; *National Farmers Union*, 471 U.S. at 856, 105 S.Ct. at 2454.

### 3. Do The Facts Of This Case Indicate That Navajo Court Jurisdiction, Over The Breach Of Contract Claim, Would Be Patently Violative Of Express Jurisdictional Prohibitions?

■ Recently, in *Stock West, Inc., v. Taylor*, 964 F.2d 912 (9th Cir.1992), an en banc panel of the Ninth Circuit visited the question of whether or not a federal court should abstain when there is a question concerning the scope of tribal court jurisdiction. In that case a non-Indian corporation brought an action in a federal district court against a non-Indian attorney who represented a tribe. The corporation was seeking to recover for legal malpractice and misrepresentation that stemmed from an opinion letter the attorney wrote in order to secure a loan for construction of a sawmill. The sawmill was to be built and managed by the corporation on tribal land. The district court granted the attorney's motion to dismiss based, at least in part, on comity. *Stock West v. Taylor*, 737 F.Supp. 601, 605 (D.Or.1990).

On appeal, the Ninth Circuit reversed and remanded holding that an off-reservation misrepresentation or fraud between two non-Indians was too distant or nebulous a connection to warrant abstention. *Stock West v. Taylor,* 942 F.2d 655, 663 (9th Cir.1991). The court further explained that the objectives sought to be furthered by the exhaustion doctrine must be examined on a case-by-case basis and more particularly that issues of self-rule and political integrity must be implicated before the exhaustion doctrine applies. *Id.* at 661. Despite the tribe's obvious interest in the case, the exhaustion doctrine did not apply and the district court should have exerted its concurrent jurisdiction. *Id.* at 664.

Rehearing en banc was granted and it was held that: (1) the district court did have diversity jurisdiction over the case, but that (2) the district court did not abuse its discretion in deciding to abstain based on comity grounds. *Stock West ·v. Taylor,* 964 F.2d 912, 919 (9th Cir.1992) (en banc). In so holding the en banc panel stated:

> [W]hether [ ] tribal law applies to a tort that involved certain acts ·committed on reservation land and other acts committed outside its territorial jurisdiction to induce another to perform a contract on tribal lands presents a colorable question that must be resolved in the first instance by the [ ] tribal courts.

964 F.2d at 920.

The court defined a "colorable question" as when "the assertion of tribal court jurisdiction is plausible and appears to have a valid or genuine basis ...," or where "undisputed facts show that 'the transactions which form the bases for appellants' claims occurred or were commenced on tribal territory.'" *Stock West,* 964 F.2d at 919 (citing *A & A Concrete, Inc. v. White Mountain Apache Tribe,* 781

F.2d 1411 (9th Cir.) *cert. denied,* 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986).

At several instances in the majority opinion, the court identified the events that gave rise to the Stock West claims as having occurred on Indian territory. *Stock West,* 964 F.2d at 917–919. Furthermore, and even more pointed to the isolation of the "on reservation" inquiry, was Judge O'Scannlain in dissent. Judge O'Scannlain disagreed that the misrepresentation giving rise to the claims arose on reservation land. He wrote: "... abstention applies only to civil actions that *arise on the reservation* because a presumption arises that tribal courts have jurisdiction.... Where the presumption of tribal jurisdiction is absent, abstention cannot be justified...." *Stock West,* 964 F.2d at 922 (O'Scannlain, J., dissenting) (emphasis added). "Because the cause of action alleged by Stock West did not arise *on the [ ] tribe's reservation,* the Supreme Court cases announcing a doctrine of abstention for exhaustion of tribal remedies, and the cases in this Circuit following them, simply do not apply." *Stock West,* 964 F.2d at 921 (O'Scannlain, J., dissenting) (emphasis added) (internal citations omitted).

The principal dispute between the majority and dissent in *Stock West,* was over the question of where the claims arose. The majority found that an answer was unclear, thereby making the question of Indian jurisdiction colorable. *Id.,* 964 F.2d at 919. The dissent thought the facts were clear and that the claim necessarily arose off the reservation. *Id.* at 921. Consequently, at least one test coming out of *Stock West,* for when an assertion of Indian civil subject matter jurisdiction is "patently violative of express jurisdictional prohibitions" is whether or not the claims arose on the reservation.[3] If they did

---

**3.** At this stage, the court must take some issue with the reasoning behind the "patently violative of express jurisdictional prohibitions" exception to the exhaustion doctrine. Of course there are some clearly defined areas where Indian jurisdiction simply cannot be allowed, such as where a tribe attempts to maintain criminal jurisdiction over a non-member of a tribe. However, at the same time, there are a number of circumstances where the "patently violative" exception can un-

dermine the principles behind the exhaustion doctrine it seeks to qualify:

Consider the scenario where an Indian files suit against a non-Indian in a tribal Court. Immediately, the non-Indian, defendant seeks an injunction in the federal district court asserting that the tribal court lacks subject matter jurisdiction over the suit. The Indian plaintiff answers in the district court claiming that the district court should abstain from hearing the prayer for injunctive relief until the non-Indian defendant

not, then Indian jurisdiction is inappropriate as it would be "patently violative of express jurisdictional prohibitions."

The case before this court is similar to *Stock West.* A contract was entered into by at least two non-Indians. That contract was performed, at least in part, on reservation lands. The parties have stipulated, and the Navajo courts have so found, that the alleged contract was formed off the reservation. However, despite these factual findings, the parties have not identified, specifically, where Pyle's and Sells' claim arose. Indeed, in its "minimum contacts" analysis the Navajo Supreme Court specifically stopped short of identifying the place where the claim arose. It stated, "the cause of action may have occurred outside the boundaries of the Navajo Nation."

For purposes of determining venue, actions based on breach of service contracts are transitory in nature and are properly brought in the county where the alleged payor resides. *Albins v. Superior Court of Yavapai County,* 7 Ariz.App. 264, 265–66, 438 P.2d 333, 334–35 (1968); *see Rito Cebolla Investments, Ltd., v. Golden West Land Corporation,* 94 N.M. 121, 123, 607 P.2d 659, 661 (App.1980); *see also* A.R.S. § 12–401(5); NMSA 1978, § 38–3–1. Further, it is a longstanding principle that actions based upon a breach of contract for failure to pay for services arise, not where the services were or are to be performed, but rather where the contract was entered or where it was breached. *See Arizona Mining Co., v. Anderson,* 33 Ariz. 64, 68–71, 262 P. 489, 490–491 (1927), *writ of error dismissed,* 278 U.S. 578, 49 S.Ct. 177, 73 L.Ed. 516 (1928); NMSA 1978,

§ 38–3–1(A). A suit based upon a failure to pay on a brokerage contract is properly commenced in the county where the defendant resides unless the brokerage agreement, which must be in writing, specifically states otherwise. *Morgensen v. Superior Court of Pima County,* 127 Ariz. 55, 56–57, 617 P.2d 1171, 1172–73, (App.1980); *see also* A.R.S. § 12–401(5).

Seemingly, because the alleged brokerage agreement between the Espils and Pyle and Sells was never reduced to writing and has been held to have been formed off the Navajo reservation, any action thereon must arise either where the brokerage contract was formed or where the brokerage contract was breached.

Given the en banc ruling in *Stock West,* however, such a ruling by this court would be inappropriate at this stage. In *Stock West* the majority found that there was a "colorable question" as to whether or not the events that gave rise to the action occurred on the reservation. They concluded:

> Section 148(f) of the Restatement (Second) of Conflict of Laws provides that a factor to be considered in determining the proper forum for an action for fraud and misrepresentation is "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." Restatement (Second) of Conflict of Laws § 148(f)(1988). Abstention in this matter will permit the [ ] tribal courts to explain whether this principle is part of its statutory or common law.

*Stock West,* 964 F.2d at 920.

Likewise, it is appropriate in this case to have the Navajo courts first pass on whether

---

exhausts his remedies in the tribal court. The non-Indian, defendant responds claiming that he does not need to exhaust his tribal remedies; his case is not properly in front of the tribal court in the first instance because for that court to hear the case it is "patently violative of express jurisdictional prohibitions."

The district court is in an inextricable quandary. It can either abstain, disregarding the Supreme Court's express exception to the exhaustion rule, or it can undermine the purposes behind the exhaustion doctrine by deciding whether or not having the case in front of the tribal court is "patently violative of express jurisdictional prohibitions." *National Farmers Union,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21.

If the district court decides that having the case heard by the tribal court is not "patently violative of express jurisdictional prohibitions," it has necessarily made a determination on the scope of tribal jurisdiction. (i.e. the district court has, at the very least, decided that it may be proper for the tribal court to hear the case.)

If the district court decides that having the case heard in front of the tribal court is "patently violative of express jurisdictional prohibitions," it has necessarily engaged in a determination on the scope of tribal jurisdiction before the tribal court has had the opportunity to make the same inquiry.

Under both scenarios the principles behind the exhaustion rule are undermined.

or not a claim for breach of an oral brokerage contract arises where the contact was entered or where the breach occurred. This will allow the Navajo courts to acknowledge whether or not this principle is a part of their statutory or common law.

Further, even if the Navajo courts reject the principle that the place to sue on an oral brokerage contract is the place where the breach occurred or where the payor resides, they will also have the important opportunity to explain whether or not Arizona and New Mexico law proscribing judicial enforcement of contracts for commissions to unlicensed brokers is part of their statutory or common law. A full record of the Navajo trial proceedings, that actually reached the merits of this case, is not before this court and it is unclear how or why Pyle and Sells prevailed on their breach of contract claim. No Navajo statute or common law principle specifically relates to oral brokerage contracts or brokerage agreements in general. However, longstanding Arizona and New Mexico laws hold that judicial aid is unavailable to parties who seek recovery of brokerage commissions in violation of licensing requirements. *See Adams Realty Corp. v. Realty Center Investments, Inc.,* 149 Ariz. 405, 719 P.2d 291 (App. 1986) (discussing the public policy behind the rule that unlicensed brokers cannot seek judicial aid in enforcing agency contracts for the sale of land); *see also* A.R.S. §§ 32–2152, 2155; NMSA 1978, § 61–29–1. Because the Navajo tribal code provides that, "[a]ny matters not covered by the traditional customs and usages or laws and regulations, may be decided by the Courts of the Navajo Nation according to the laws of the state in which the matter in dispute may lie ...," 7 N.T.C. § 204(c), it is somewhat puzzling why the result in the Navajo trial court was in favor of Pyle and Sells who are not licensed brokers. By abstaining from ruling on the scope of the tribe's civil subject matter jurisdiction this court will provide the Navajo courts with an opportunity to explain whether or not this principle of Arizona and New Mexico law comports with Navajo statutory or common law.

Finally, abstention will also allow the parties to brief the issue of where this alleged claim arose.

Therefore,

IT IS ORDERED that the Plaintiffs' Motion for Preliminary Injunction (doc. # 2) is denied.

IT IS FURTHER ORDERED that the defendants' Motion for Consolidation of Preliminary Injunction Hearing With Trial on the Merits (doc # 6) is denied as moot.

IT IS FURTHER ORDERED that the defendants' Request for Accelerated Ruling (doc # 25) is denied as moot.

IT IS FURTHER ORDERED that this action is dismissed without prejudice. The Clerk of the Court shall enter judgment accordingly. Dated this 30th day of March, 1994.