**STOCK WEST, INC., an Oregon corporation,**
**Plaintiff/Appellee/Cross–Appellant,**

v.

**CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; Colville Reservation; Colville Business Council; Colville Tribal Enterprise Corporation, and; Colville Indian Precision Pine Corporation, Defendants/Appellants/Cross–Appellees.**

Nos. 87–4123, 87–4119.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1989.

Decided April 20, 1989.

Michael Taylor, Nespelem, Wash., for defendants-appellants-cross-appellees.

Barbee B. Lyon and John H. Boone, San Francisco, Cal., for plaintiff-appellee-cross-appellant.

Before WRIGHT, TANG and WIGGINS, Circuit Judges.

TANG, Circuit Judge:

Stock West, Inc. contracted with two Colville tribal entities to construct and later manage a sawmill on the Colville reservation. The tribe claimed that Stock West failed to perform its contractual duties and brought an action in tribal court. Stock West filed a demand for arbitration in tribal court pursuant to terms of the contracts. The tribal court ruled that it had jurisdic-

tion, and ruled also that since the validity of the arbitration clauses was in doubt, the court would decide the underlying contract dispute rather than have the matter submitted to arbitration. A February 1989 trial date has been set.

Stock West then filed an action in district court to compel arbitration and to enjoin the tribal court proceedings. The district court ruled that it had diversity jurisdiction to compel arbitration, but that it would not exercise its jurisdiction and instead would dismiss the case on the grounds of comity. On appeal, Stock West challenges the dismissal and the refusal to compel arbitration, and the tribe cross-appeals challenging the ruling that the district court had jurisdiction.

## I. *Factual Background*

### A. Background to Contracts

In November and December 1983, members of the Stock family met with representatives of the Confederated Tribes of the Colville Reservation to discuss the possibility of building a sawmill on the reservation. The meetings took place both at the Stocks' office in Oregon and on the reservation in Washington. A Professional Services Agreement ("PSA") signed by James Stock and a tribal representative on January 20, 1984, provided that "Stockwest"[1] was to provide business and marketing plans concerning the proposed sawmill to the tribe. According to paragraph 11 of the PSA:

[a]ll disputes over the subject matter of this agreement or performance thereof will proceed to final resolution in Colville Tribal Courts and be controlled and bound by the laws of the Colville Confederated Tribes.

Supp. ER Tab 7.[2]

### B. The Contracts: The CMA and the MMA

The two major contracts at issue in this case are the Construction Management Agreement ("CMA") and the Management and Marketing Agreement ("MMA"). These contracts were signed on July 23, 1984 by James Stock on behalf of Stock West, and a tribal representative on behalf of Colville Tribal Enterprise Corporation ("CTEC") and Colville Indian Precision Pine Company ("CIPP").[3] These contracts were signed on the reservation.

Under the CMA, Stock West was to manage and supervise all facets of the construction of the sawmill. Stock West maintained an office at CIPP headquarters on the reservation. The construction itself was not to be performed by Stock West, but rather by tribal employees or contractors. Actual construction of the sawmill started in approximately August 1984 and was substantially completed by February 1986.

Under the MMA, Stock West was to provide management and marketing services once the sawmill was in operation. To perform these contractual obligations, James Stock was made a director and president of CIPP. Stock West also opened a sales office in Portland, Oregon and served as a selling agent of CIPP.

For the purposes of the present controversy, the most relevant provisions of the contracts are the sections dealing with arbi-

---

**1.** At the time the PSA was signed, "Stockwest" did not exist. On February 27, 1984, Stock West was incorporated under the laws of Oregon with James Stock one of the original directors.

**2.** "ER" refers to the Excerpt of Record submitted by Stock West, and "Supp. ER" refers to the Supplemental Excerpt of Record submitted by the tribe.

**3.** CTEC was an entity separate from the tribal Business Council and was created to deal with the building of the sawmill. CIPP was organized as a wholly owned subsidiary of CTEC to own and operate the sawmill after completion. Both CTEC and CIPP were organized and chartered pursuant to tribal law.

tration,[4] choice of law,[5] and waiver of sovereign immunity.[6] But unlike the PSA, neither the CMA nor the MMA include a provision vesting jurisdiction in tribal court.

## II. *Procedural Background*

### A. Tribal Court Proceedings

According to the tribe, Stock West failed to perform its contractual duties. Around July 15, 1986, the tribal parties served on Stock West a Notice of Default.[7] Stock West filed a response on July 28, 1986 in which it did not answer the tribe's claims of default but instead filed a demand for arbitration and selected an arbitrator as per the terms of the contracts. The tribe refused to agree to arbitration and refused to pay Stock West sums that Stock West says was owed.

On July 30, 1986, the tribe filed for (a) declaratory and injunctive relief, (b) recoupment of money paid and damages, and (c) a temporary restraining order (TRO). The tribal court issued the TRO. An amended complaint was filed on March 4, 1987.

On August 7, 1986, Stock West filed a Special Appearance in tribal court and entered into a Stipulated Joint Motion for Continuance on the hearing for the preliminary injunction. On August 22, 1986, the tribal court entered a preliminary injunction restraining Stock West from interfering with operations at the mill and requiring the tribe to post a bond.

On August 17, 1987, after full briefing and oral argument, the tribal court ruled in a published decision that it had jurisdiction over the defendants. *Confederated Tribes of the Colville Reservation v. Stock West,* 14 Ind.L.Rep. 6025 (Colville Tribal Ct.1987).

Stock West then filed motions to dismiss the tribe's action and to compel arbitration under the terms of the contracts and the federal Arbitration Act. 9 U.S.C. §§ 1–4. Again after full briefing and oral argument, the tribal court denied these motions on May 2, 1988, ruling that the CMA and MMA were void for lack of Bureau of Indian Affairs (BIA) approval[8] and that the tribe's claims are thus a matter for the court, not an arbitrator, to resolve. *Confederated Tribes of the Colville Reservation v. Stock West,* 15 Ind.L.Rep. 6019 (Colville Tribal Ct.1988).

**4.** The CMA (Section 6) and the MMA (Section 12) have identical arbitration clauses which provide in part that:

> [a]ll claims disputes and other matters in question between the parties arising out of or relating to this agreement or the breach thereof, shall be decided in accordance with the following procedure. Either party may demand arbitration and appoint an arbitrator, and the other party shall appoint a second arbitrator within thirty (30) days after being notified in writing of the appointment of the first arbitrator. The two arbitrators shall select a third, and the decision of the three arbitrators or a majority of them shall be final and binding on both parties.... This provision shall be specifically enforceable.... The award rendered by the arbitrators shall be final, and judgment may be rendered upon it in accordance with applicable law in any court having jurisdiction thereof.

**5.** The CMA (Section 14b) indicates that "[t]he validity, meaning, enforceability and effect of this agreement, and the rights and liabilities of the parties hereto, shall be determined in accordance with the laws of Washington." The MMA (Section 20.2), with identical language, provides that Oregon law is to apply.

**6.** Both the CMA (Section 11) and the MMA (Section 18) provide that "CIPP and CTEC hereby expressly waive their sovereign immunity from suit or action in a court of competent jurisdiction by Stock West for all matters arising out of or relating to this agreement."

**7.** Section 7.1 of the CMA and Section 14.1 of the MMA ("Default by Stock West") allow CTEC or CIPP to terminate the contract in the event of Stock West's default. Default is defined to included the failure of Stock West to perform any contractual duty. ER Tabs A–B.

**8.** According to 25 U.S.C. § 81, "[n]o agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, ... unless such ... agreement ... shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it." Both the CMA and the MMA make reference to 25 U.S.C. § 81. Section 14 of the CMA indicates compliance with other provisions of 25 U.S.C. § 81 and the MMA includes a provision to be signed by the BIA. But no BIA approval was ever obtained for the contracts. *Confederated Tribes of the Colville Reservation v. Stock West,* 15 Ind.L. Rep. 6019 (Colville Tribal Ct.1988).

On July 25, 1988, the tribal court entered a pretrial order setting discovery deadlines. A trial date was set for February 13, 1989.

### B. District Court Proceedings

On April 7, 1987, Stock West filed an action in federal district court to compel arbitration under the terms of the CMA and the MMA and to enjoin the tribal parties from pursuing the matter in tribal court. After a hearing, the district court granted the tribe's motion to dismiss.[9] Although the district court found that it had diversity jurisdiction under 28 U.S.C. § 1332, it dismissed Stock West's action, ruling that

> out of a sense of comity this Court should abstain in favor of Tribal Court jurisdiction, which [Stock West] concedes is concurrent.

ER TabE.

Stock West now brings this appeal, challenging the district court's dismissal of its action and refusal to compel arbitration. The tribe cross-appeals, challenging the district court's determination that it had jurisdiction to compel arbitration.

### III. *Does Federal Subject Matter Jurisdiction Exist?*

In considering the jurisdiction questions, it should be remembered that "[i]t is a fundamental principle that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *California ex rel. Younger v. Andrus*, 608 F.2d 1247, 1249 (9th Cir.1979).

Although a district court's determination of federal subject matter jurisdiction is reviewed de novo, *Mobil Oil Corp. v. City of Long Beach*, 772 F.2d 534, 538 (9th Cir.1985), the district court's factual findings on jurisdictional issues must be accepted unless clearly erroneous. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir. 1985).

### A. Federal Question Jurisdiction Under 28 U.S.C. § 1331

It is clear that with respect to the underlying substantive dispute, the tribe is correct in declaring that no federal question jurisdiction exists in this case.[10] According to 28 U.S.C. § 1331:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

Stock West cites in its complaint the Declaratory Judgment Act, 28 U.S.C. § 2201, as a basis for jurisdiction. But this Act only creates a remedy and is not an independent basis for jurisdiction. *California Dump Truck Owners Assoc. v. Associated Gen. Contractors*, 562 F.2d 607 (9th Cir. 1977). To obtain declaratory relief in federal court, there must be an independent basis for jurisdiction. *Miller–Wohl Co. v. Commissioner of Labor & Indus.*, 685 F.2d 1088 (9th Cir.1982). Similarly, Stock West's reliance on the Arbitration Act, 9 U.S.C. §§ 1–4, is insufficient to confer federal question jurisdiction. *General Atomic Co. v. United Nuclear Corp*, 655 F.2d 968 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982).

In addition, federal question jurisdiction does not exist merely because an Indian tribe is a party or the case involves a contract with an Indian tribe.[11] "Other-

---

9. Originally, the defendants in the federal action were the tribe itself, the tribal business council, CTEC, and CIPP. At the time of the district court's dismissal order, only CTEC and CIPP remained as defendants.

10. Although Stock West claimed federal question jurisdiction in its original complaint, in its appellate brief, Stock West cites only diversity as the basis for jurisdiction and makes no mention of federal question jurisdiction. Stock

West appears to have abandoned its argument that the action arises under 28 U.S.C. § 1331.

11. Stock West argues that since the tribe waived its sovereign immunity in both the CMA (Section 11) and in the MMA (Section 18), the federal courts thus have jurisdiction. This argument is weak. Mere consent to be sued does not confer jurisdiction on any particular court. *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668 (8th Cir.1986).

wise the federal courts might become a small claims court for all such disputes." *Gila River Indian Community v. Henningson, Durham & Richardson,* 626 F.2d 708, 715 (9th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981).[12]

**B. Diversity Jurisdiction Under 28 U.S.C. § 1332**

In considering whether federal diversity jurisdiction exists, aside from issues of exhaustion and comity, the wording of 28 U.S.C. § 1332 must be considered, which provides in relevant part that

> [t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state . . .

28 U.S.C. § 1332(a).[13]

■ 1. *Citizenship of Tribal Parties.* Regarding the citizenship of the tribal parties for the purposes of diversity jurisdiction, first, it is perhaps clear that an Indian tribe is not a foreign state. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 20, 8 L.Ed. 25 (1831). Thus, diversity jurisdiction must depend upon the tribal parties, CTEC and CIPP, being a resident of the state in whose borders the reservation is located, in this case, Washington. There is authority for the proposition that for purposes of diversity jurisdiction, an Indian corporation is a citizen of the state in whose borders the reservation is located. *R.C. Hedreen Co. v. Crow Tribal Hous. Auth.,* 521 F.Supp. 599, 602–03 (D.Mont. 1981); *see also R.J. Williams Co. v. Fort Belknap Hous. Auth.,* 719 F.2d 979, 982 n. 2 (9th Cir.1983), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985) (tribal housing authority considered Montana citizen for diversity purposes); *Parker Drilling Co. v. Metlakatla Indian*

*Community,* 451 F.Supp. 1127, 1138 (D. Alaska 1978) (corporate entity of an Alaskan Indian community considered Alaska citizen for diversity purposes); W. Canby, *American Indian Law* 151 (1981) (For diversity purposes, "Indians are citizens of the states where they reside.").

2. *Citizenship of Stock West.* Since the amount in controversy exceeds $10,000, the remaining question is whether Stock West is also a Washington citizen, in which case diversity would be defeated. For the purposes of diversity jurisdiction, a corporation is a citizen of any state in which it is incorporated *and* of the state where it has its principal place of business. 28 U.S.C. § 1332(c). In *Co-Efficient Energy Sys. v. CSL Indus., Inc.,* 812 F.2d 556 (9th Cir. 1987), for example, a corporation incorporated in Nevada but with a principal place of business in California sued California defendants. The court ruled that as per 28 U.S.C. § 1332(c), no diversity jurisdiction existed and that the case was properly dismissed. Similarly, in the instant case, the tribe argues that although Stock West was incorporated in Oregon, its sole place of business was in Washington and thus it should be considered a Washington citizen for diversity purposes.

We presume that the factual basis for the district court's finding of diversity jurisdiction was that the tribal parties were citizens of Washington and that Stockwest was a citizen of Oregon. We defer to the district court on this factual issue and find that the parties are of diverse citizenship.

■ 3. *Diversity Jurisdiction.* Given the existence of diversity of citizenship between the parties and at least $10,000 in controversy, the next question is whether the district court necessarily had diversity jurisdiction under 28 U.S.C. § 1332 considering the presence of tribal parties.

The diversity jurisdiction of federal courts is more limited in Indian country than it is elsewhere. The limitation

**12.** Nevertheless, as discussed below, the issue of whether the tribal court has jurisdiction is a federal question that a federal court may consider after tribal court remedies have been exhausted.

**13.** On May 19, 1989, the amount in controversy requirement will increase to $50,000. 102 Stat. 4646 (1988).

arises from the fact that federal courts in diversity cases sit as alternatives to the state courts and apply state law. In that capacity, they have the same potential of interfering with tribal self-government that the state courts do.

W. Canby, *American Indian Law* 151–52 (1981).

According to *R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir.1983), in order for a federal court to have diversity jurisdiction, "the courts of the state in which the federal court sits must be able to entertain the action." *See also Hot Oil Serv., Inc. v. Hall*, 366 F.2d 295, 297 (9th Cir.1966) ("In our case, the District Court could not have had diversity jurisdiction unless the state court would also have had subject-matter jurisdiction."); *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949) ("where ... one is barred from recovery in the state court, he should likewise be barred in the federal court"). Following this reasoning, because the Washington state courts would arguably not have jurisdiction to hear the instant case under the holding of *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959),[14] no diversity jurisdiction would exist.

The vitality of the reasoning set forth in *R.J. Williams*, *Hot Oil*, and *Woods*, however, is now dubious in light of the Supreme Court's opinion in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), which involved diversity of citizenship between Indian and non-Indian parties, and presumably an amount in controversy exceeding $10,000. The federal District Court in *Iowa Mutual*, citing *Woods*, noted that since the Montana state courts lacked jurisdiction over the suit,[15] it also lacked subject matter jurisdiction and dismissed the case. 480 U.S. at 13, 107 S.Ct. at 975. We affirmed in an unpublished opinion. 774 F.2d 1174 (9th Cir. 1985). The Supreme Court held in favor of deferral to the tribal courts, but ruled that we "should not have affirmed the District Court's dismissal for lack of subject-matter jurisdiction." 480 U.S. at 19–20, 107 S.Ct. at 978–79. Therefore, a federal court may have diversity jurisdiction under 28 U.S.C. § 1332 with tribal parties even if the state courts would not have jurisdiction. We thus hold that the district court below correctly held in favor of diversity jurisdiction. The tribe's cross-appeal is denied.

### IV. *Did the District Court Err in not Exercising its Jurisdiction and in Dismissing the Case on the Grounds of Comity?*

Having found subject matter jurisdiction, the next question is whether the district court should have exercised its jurisdiction or deferred to the tribal court. We analyze this question in a two-step process, first by considering whether the tribal court has jurisdiction, and second by considering the public policies underlying the principle of comity in this context.

### A. Does The Tribal Court Have Jurisdiction?

 Once all tribal remedies are exhausted and the tribal courts finally decide that tribal jurisdiction exists, then the district court can decide the question of tribal jurisdiction. This determination is in itself a "federal question" which federal courts have jurisdiction to review under 28 U.S.C. § 1331. *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 852, 105 S.Ct. 2447, 2452, 85 L.Ed.2d 818 (1985). Thus, in the instant case, if tribal remedies were exhausted on the jurisdiction issue, the district court would have jurisdiction under 28 U.S.C. § 1331 to review the tribal court's finding of jurisdiction. By deferring to the tribal court proceedings because of comity, the district court was essentially ruling that the tribal court has jurisdiction to hear the case. We have jurisdiction to review this decision under 28 U.S.C. § 1291.

The Colville Tribal Law and Order Code, § 1.9.01, provides for a three-judge tribal

---

**14.** *See* P.L. 280; Wash.Rev.Code § 37.12.010 et. seq.

**15.** *See* P.L. 280; Mont.Code Ann. § 2–1–301 et. seq.

Appellate Court "to hear appeals from final judgments, sentences, and other final orders of the Trial Court." Presumably, the Colville Appellate Court could review the trial court's findings as to tribal jurisdiction in the instant case, though not necessarily on an interlocutory basis. Therefore, under *National Farmers*, the federal courts should not even make a ruling on tribal court jurisdiction in this case until tribal remedies are exhausted. We could dismiss on this basis alone. *See* footnote 19 and accompanying text, *infra*.

Assuming, arguendo, that the federal courts could decide the tribal jurisdiction question, the tribal courts have jurisdiction to hear this case, even if the jurisdiction is concurrent with the federal judiciary. "Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, their civil jurisdiction is not similarly restricted." *Iowa Mutual*, 480 U.S. at 13, 107 S.Ct. at 975 (citation omitted).

There is no simple test for determining whether tribal court jurisdiction exists. The Court in *National Farmers* concluded that

> the answer to the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians ... is not automatically foreclosed.... Rather, the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

471 U.S. at 855–56, 105 S.Ct. at 2453–54.

Also, the Court in *Iowa Mutual* noted that civil jurisdiction over the activities of non-Indians on reservation lands "presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. at 18, 107 S.Ct. at 978. The court went on to point out that in matters concerning reservation affairs, "tribal courts are best qualified to interpret and apply tribal law." *Id.* at 16, 107 S.Ct. at 977.

In the instant case, it seems clear that the tribal court has jurisdiction. The dispute arises out of the reservation and concerns tribal resources, and there are apparently no treaties or statutes [16] that would limit tribal court jurisdiction in this case. In addition, Colville tribal law explicitly provides for jurisdiction in cases like this. [17]

As an additional issue, the tribe claims that the question of tribal jurisdiction is moot because Stock West had consented to tribal jurisdiction. [18] The tribe cites the case of *Cowan v. Rosebud Sioux Tribe*, 404 F.Supp. 1338 (D.S.D.1975) to support this argument. But the *Cowan* case merely stands for the proposition that *personal* jurisdiction may be waived by contract. *See also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). On the other hand, a party cannot waive by consent or contract a court's lack of *subject matter* jurisdiction. *Securities & Exchange Comm'n v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir.1979). Thus, even if the consent of Stock West was adequate to

---

**16.** Stock West argues that the strong federal policy favoring arbitration, such as embodied in the Arbitration Act, 9 U.S.C. § 2, should overcome the policy of comity in favor of the tribal court. But Stock West does not argue that the Arbitration Act deprives the tribal court of jurisdiction. Furthermore, particularly since the validity of the arbitration clauses in the contracts are themselves in dispute, Stock West's argument that the federal courts should not defer to the tribal court is weak.

**17.** "The jurisdiction of the Tribal Court and the effective area of this Code shall include all territory within the Reservation boundaries, and the

lands outside the boundaries of the Reservation held in trust by the United States for Tribal members of the Tribes, and it shall be over all persons therein...." Colville Law and Order Code § 1.3.01. The Code further provides that tribal jurisdiction is to be concurrent with "any valid" federal or state jurisdiction. § 1.3.02.

**18.** Actually, rather than being moot, since Stock West has not yet exhausted its tribal remedies through the Colville Appellate Court on the question of whether the tribal court has jurisdiction, the instant case might be better characterized as having a *ripeness* problem.

confer personal jurisdiction onto the tribal court, the question of whether the tribal court has subject matter jurisdiction over the case would still not be resolved.

**B. Was the District Court's Deferral to the Tribal Court on the Grounds of Comity Appropriate?**

 Because abstention involves the discretionary exercise of a court's equity powers, it is reviewed only for an abuse of discretion. *Turf Paradise, Inc. v. Arizona Downs,* 670 F.2d 813 (9th Cir.), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982); *see also Coats v. Woods,* 819 F.2d 236, 237 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 46, 98 L.Ed.2d 11 (1987). The abuse of discretion standard likewise should apply to the district court's dismissal in favor of the tribal court proceedings in the instant case.

The *Iowa Mutual* case, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), is directly relevant to this issue. In *Iowa Mutual,* LaPlante, a Blackfeet Indian, sued Iowa Mutual, an Iowa corporation, in Blackfeet Tribal Court for damages resulting from a truck accident on the reservation.[19] The Blackfeet reservation is located within the borders of Montana. The tribal court ruled that it had jurisdiction to hear the case.[20] Iowa Mutual, asserting diversity jurisdiction, then brought an action in federal court against LaPlante seeking declaratory relief. The district court dismissed the case for lack of subject matter jurisdiction and we affirmed. 774 F.2d 1174 (9th Cir. 1985). The Supreme Court reversed, ruling that the district court should not have dismissed but should have either (a) retained jurisdiction and stayed any action pending the tribal courts' resolution of the jurisdiction question, or (b) prudentially dismissed the case in favor of the tribal court proceedings. *Iowa Mutual,* 480 U.S. at 19–20, 107 S.Ct. at 978–79. The Court, reiterating the holding of *National Farmers,* 471 U.S.

at 856, 105 S.Ct. at 2454, that exhaustion of tribal remedies is a prerequisite to a federal action, held that since Iowa Mutual had not fully exhausted tribal remedies by appealing to the Blackfeet Tribal Appeals Court, the federal action should not proceed. *Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978.

Also, in *Wellman v. Chevron U.S.A., Inc.,* 815 F.2d 577 (9th Cir.1987), a Blackfeet Indian contractor brought a diversity action for breach of contract against a non-Indian corporation involving work that was to have been performed on tribal lands. The district court dismissed for lack of subject matter jurisdiction. Citing *Iowa Mutual,* we found that "[t]he ruling was correct though based on the wrong reason. The dismissal should have been based upon comity, rather than lack of subject matter jurisdiction." *Wellman,* 815 F.2d at 578; *see also Littell v. Nakai,* 344 F.2d 486, 489 (9th Cir.1965) (even though the litigation "falls within the letter of the diversity statute, we believe that the basic principle of diversity jurisdiction requires reference of the suit to the Navajo Tribal Courts"), *cert. denied,* 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966).

Indeed, the existence of diversity jurisdiction does not preclude a federal court from deferring to tribal proceedings because of comity.

> [t]he diversity statute ... makes no reference to Indians and nothing in the legislative history suggests any intent to render inoperative the established federal policy promoting tribal self-government.

*Iowa Mutual,* 480 U.S. at 17, 107 S.Ct. at 977.

Furthermore, the requirement for exhaustion can exist in the presence of federal jurisdiction. The Court in *Iowa Mutual* specifically noted that the requirement of exhaustion of tribal remedies does not de-

---

**19.** In tribal court, LaPlante also named his employer and an insurance adjuster as defendants. *Iowa Mutual,* 480 U.S. at 11, 107 S.Ct. at 974.

**20.** Although there is an appellate court within the Blackfeet judiciary, tribal law does not al-

low interlocutory appeals from jurisdictional rulings. Thus, appellate review of the tribal court's jurisdictional ruling can occur only after a decision on the merits. *Iowa Mutual,* 480 U.S. at 16–17, 107 S.Ct. at 976–77.

prive the federal courts of jurisdiction. 480 U.S. at 16 n. 8, 107 S.Ct. at 976 n. 8.

It was proper for the district court to defer on the grounds of comity. The correctness of the district court's application of comity is supported by the facts that "Congress is committed to a policy of supporting tribal self-government and self-determination." *National Farmers*, 471 U.S. at 856, 105 S.Ct. at 2454 (footnote omitted), and that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." *Iowa Mutual*, 480 U.S. at 18, 107 S.Ct. at 978. Indeed, "[i]n diversity cases, ... unconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs." *Id.* at 16, 107 S.Ct. at 977.

The judgment of the district court is AFFIRMED.