LARRY R. HICKS, UNITED STATES DISTRICT JUDGE
Before the court is defendants the United States Bureau of Land Management ("BLM") and Jill Silvey's ("Silvey") (collectively "defendants") motion to dismiss defendant-intervenor Carlin Resources, LLC's ("Carlin") cross-claims (ECF No. 98). ECF No. 103. Carlin filed an opposition (ECF No. 112) to which defendants replied (ECF No. 120).
I. Facts and Procedural Background
This action has an extensive factual and procedural history,[1] but in brief, this action involves the various agency decisions and federal permits issued by the BLM authorizing a mining project on land known as the Tosawihi Quarries located in Elko County, Nevada.[2] Specific portions of the quarries have been identified by plaintiff the Battle Mountain Band of the Te-Moak Tribe of Western Shoshone Indians ("Battle Mountain Band" or "the Band")[3] as its traditional cultural property ("TCP").[4]
Defendant BLM is the federal agency responsible for overseeing and administering *1231 public lands, including the public lands on which the Tosawihi Quarries and the Battle Mountain Band's identified TCPs exist. As part of its administration of these lands, the BLM is authorized to issue permits and leases for use of the land, including the mining of natural resources. The BLM is also authorized to make eligibility determinations for the inclusion of land, including TCPs, on the National Register of Historic Places ("National Register").[5] At all relevant times, defendant Silvey was the Elko District Manager of the BLM and was the person in charge of the Tosawihi Quarries.
Intervenor Carlin is the owner of certain mining rights within the Tosawihi Quarries. In 2008, Carlin applied for a permit from the BLM to convert certain land within the quarries from an exploratory mining area into a functional mining operation known as the Hollister Mine Project ("the project"). The project was ultimately approved by the BLM on March 31, 2014, after six-years of agency and public review including: the issuance of environmental impact statements as required by the National Environmental Policy Act ("NEPA"); the completion of Class III historical surveys and inventories[6] in compliance with Section 106 of the National Historic Preservation Act ("NHPA"); several BLM decisions concerning the eligibility of the Battle Mountain Band's identified TCPs for inclusion on the National Register;[7] the negotiation of an ongoing agreement for the preservation of historic lands during the project between the BLM, Carlin, and non-parties the Nevada State Historic Preservation Office ("NSHPO") and the Advisory Council on Historic Preservation ("ACHP"), known as the Programmatic Agreement ("project PA");[8] and the issuance *1232 of a final Record of Decision ("ROD") approving the project.
In late 2015, after the project ROD had been issued, the Battle Mountain Band invoked the dispute resolution provisions of the project PA in an effort to have the BLM determine the eligibility of new TCPs, not previously identified during the six-year NHPA and NEPA review process, for inclusion on the National Register. On April 19, 2016, after completion of the dispute resolution process, the BLM, without consultation with Carlin, determined that the newly identified TCPs were eligible for inclusion on the National Register. Thereafter, on May 19, 2016, the Battle Mountain Band filed the underlying complaint for declaratory and injunctive relief alleging that defendants violated NHPA by failing to reconsider their decision to allow Carlin to proceed with the project on land which the BLM now considers eligible for the National Register.
In response to the Band's complaint, Carlin filed a motion to intervene under Rule 24 of the Federal Rules of Civil Procedure (ECF No. 20) which was granted by the court (ECF No. 55). After being granted the right to intervene in this action, Carlin filed cross-claims against defendants alleging three causes of action: (1) violation of NHPA; (2) violation of 43 C.F.R. § 3809; and (3) violation of the Administrative Procedures Act ("APA"). ECF No. 98. In its cross-claims, Carlin alleges that defendants' failure to consult with Carlin on the BLM's April 2016 decision that certain land within the Tosawihi Quarries was eligible for inclusion on the National Register was procedurally improper and contrary to Carlin's rights under the project PA. Id. Thereafter, defendants filed the present motion to dismiss Carlin's cross-claims on the basis of Article III and prudential standing. ECF No. 103.
II. Legal Standard
A. Subject Matter Jurisdiction
Federal courts are courts of limited jurisdiction. Owen Equip. & Erection Co. v. Kroger , 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." Stock West, Inc. v. Confederated Tribes of the Colville Reservation , 873 F.2d 1221, 1225 (9th Cir. 1989).
Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). A party may bring a motion to dismiss pursuant to Rule 12(b)(1) either as a facial challenge or as a factual challenge to the court's subject matter jurisdiction. Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp. , 594 F.2d 730, 733 (9th Cir. 1979). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise involve federal jurisdiction." Safe Air for Everyone v. Meyer , 373 F.3d 1035, 1039 (9th Cir. 2004). In their motion to dismiss, defendants raise a facial challenge to Carlin's cross-claims contending that, based on the allegations in the cross-claims, Carlin lacks constitutional standing. See ECF No. 103.
Although the challenger is the moving party in a motion to dismiss under *1233 Rule 12(b)(1), the non-moving party is the one invoking the court's jurisdiction. As such, the non-moving party bears the burden of proving that the case is properly in federal court. McCauley v. Ford Motor Co. , 264 F.3d 952, 957 (9th Cir. 2001) (citing McNutt v. Gen. Motors Acceptance Corp. , 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936) ). A party seeking relief in federal court must establish it has constitutional standing to assert its claims. See Lujan v. Defenders of Wildlife , 504 U.S. 555, 559-60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish constitutional standing, a party must show that: (1) they have suffered an "injury in fact;" (2) there is a causal connection between the injury and the relevant agency's decision; and (3) that the injury can be redressed in court. Id. at 560-61, 112 S.Ct. 2130. A party who lacks constitutional standing to bring its claims lacks the requisite subject matter jurisdiction before the court. See id. at n.4 (citing Newman-Green, Inc. v. Alfonzo-Larrian , 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) ).
B. Motion to Dismiss
Defendants also seek dismissal on the basis that Carlin lacks prudential standing to bring its cross-claims. See ECF No. 103. Prudential standing is a self-imposed limit on the role of the courts concerning federal agency decisions. Bennett v. Spear , 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). To have prudential standing to bring a claim, a party must show that its claim for relief falls within the particular zone of interests protected or regulated by the federal statute invoked in the suit. Id. Essentially, prudential standing answers the question of whether the relevant statute or constitutional provision can be understood to grant the party a right to judicial relief. Warth v. Seldin , 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).
A prudential standing challenge is properly analyzed under Rule 12(b)(6) of the Federal Rules of Civil Procedure because if the relevant statute or constitutional provision does not entitle the party to judicial relief, then that party has failed to state a claim upon which relief can be granted. See Lexmark Intern., Inc. v. Static Control Components, Inc. , --- U.S. ----, 134 S.Ct. 1377, 1387, 188 L.Ed.2d 392 (2014). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must satisfy the notice pleading standard of Rule 8(a)(2). See Mendiondo v. Centinela Hosp. Med. Ctr. , 521 F.3d 1097, 1103 (9th Cir. 2008).
Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8(a)(2) does not require detailed factual allegations; however, a pleading that offers only " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' " is insufficient and fails to meet this broad pleading standard. Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). To sufficiently allege a claim under Rule 8(a)(2), viewed within the context of a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Twombly , 550 U.S. at 570, 127 S.Ct. 1955 ). The relevant inquiry in a prudential standing challenge is for the court to determine, "using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark , 134 S.Ct. at 1387 (internal quotations omitted).
*1234 III. Discussion
In its cross-claims, Carlin alleges that defendants violated their contractual and statutory duties when they failed to consult with Carlin concerning the BLM's April 2016 decision to designate land within the project area as eligible for inclusion on the National Register after the BLM had already approved the project and issued its ROD. See ECF No. 98. In their motion to dismiss, defendants assert that the project PA does not grant Carlin any ongoing consultation rights concerning National Register eligibility determinations and thus, Carlin lacks both constitutional and prudential standing to allege its cross-claims. See ECF No. 103. The court shall address each standing challenge below.
A. Constitutional Standing
In their motion to dismiss, defendants contend that Carlin has failed to establish that it suffered an "injury in fact" arising from the BLM's April 2016 eligibility determination, and therefore, Carlin has failed to satisfy the first requirement for constitutional standing. However, as addressed below, the court finds that Carlin has alleged a sufficient injury in fact to establish constitutional standing arising from defendants' alleged failure to consult with Carlin prior to the BLM's April 2016 decision.[9]
An "injury in fact" for purposes of constitutional standing is one in which the plaintiff has suffered an "invasion of a legally protected interest" that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." Lujan , 504 U.S. at 560, 112 S.Ct. 2130. An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." Id. at n.1. The Supreme Court has since interpreted this requirement to mean that a plaintiff must allege an injury that individually affects the particular plaintiff rather than simply a demographic, group, or category of people. See Spokeo, Inc. v. Robins , --- U.S. ----, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016). Further, an injury is "concrete" when it poses a real risk or threat of harm to a plaintiff rather than simply an abstract threat of harm. Id. at 1548-49. Finally, an injury is "imminent" when the particular harm is "certainly impending" and not merely hypothetically possible. Clapper v. Amnesty Intern. USA , 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (citing Whitmore v. Arkansas , 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ).
In its cross-claims, Carlin asserts that the project PA, which governs the mining project, grants Carlin a right to be consulted in decisions affecting its rights in the project including eligibility determinations on newly identified TCPs. See ECF No. 98. In opposition, defendants argue that the project PA only provides ongoing consultation rights to Tribal governments (including the Battle Mountain Band) for the duration of the project and that Carlin's consultation rights were limited solely to eligibility determinations on TCPs identified *1235 as a result of completed Class III surveys and inventories. See ECF No. 103.
Initially, the court finds that the project PA, entered into and executed by the BLM, Carlin, and other non-parties to this action, is a legal contract binding the parties to the terms of the project PA for the duration of the mining project. See Tyler v. Cuomo , 236 F.3d 1124, 1134 (9th Cir. 2000) (holding that a memorandum of agreement ("MOA") entered into by a city "is a contract" and that "the City is bound by its terms" where the city entered into the MOA to satisfy its NEPA and NHPA requirements); see also Mobil Oil Expl. & Producing Southeast, Inc. v. U.S. , 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (holding that when the United States enters into contractual relations, its rights and duties therein are governed by the law applicable to contracts between private individuals); 34 C.F.R. § 800.14 (stating that parties "may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" which will govern the project). Because the project PA is a binding contract between the parties, the court must interpret the project PA and determine whether it provides Carlin with ongoing consultation rights related to the BLM's National Register eligibility determinations for the duration of the project.
The starting point for the interpretation of any contract is the plain language of the contract. McDaniel v. Sierra Health & Life Ins. Co., Inc. , 118 Nev. 596, 53 P.3d 904, 906 (2002) ; see also Klamath Water Users Protective Ass'n v. Patterson , 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first."). When a contract contains clear and unequivocal provisions, those provisions shall be construed according to their usual and ordinary meaning. Dickenson v. Nevada , 110 Nev. 934, 877 P.2d 1059, 1061 (1994). However, a contract or contract provision may be ambiguous if it is "reasonably susceptible to more than one interpretation." Shelton v. Shelton , 119 Nev. 492, 78 P.3d 507, 510 (2003). If a contract or contract provision is ambiguous, that provision should be construed against the drafter of the contract, in this case, the BLM. See 5-24 Corbin, Contracts, § 24.27. The determination "of whether contract language is ambiguous is a question of law." Klamath Water Users , 204 F.3d at 1210.
In their motion to dismiss, defendants insist that Carlin's consultation rights on National Register eligibility determinations were specifically limited to initial eligibility determinations after the completion of Carlin's Class III inventories and terminated upon the completion of those inventories. See ECF No. 103. As such, defendants argue that Carlin has no ongoing consultation rights on eligibility determination that arises later in the project. The court disagrees. Specifically, the court has reviewed the documents and pleadings on file in this matter and finds that under the project PA Carlin is entitled to ongoing consultation on National Register eligibility determinations on land within the project area for the duration of the mining project.
In support of their position, defendants identify three provisions of the project PA they contend establish that Carlin does not have any ongoing consultation rights on eligibility determinations: Section D(12)(c);[10] Section D(2)(f);[11] and Section *1236 D(3).[12] Defendants argue that both Sections D(2)(f) and D(12)(c) govern ongoing consultation of certain decisions for the duration of the project and specifically identify and limit that ongoing consultation to Tribal governments and tribal groups like the Battle Mountain Band. See ECF No. 106, Ex. 1, Section D(2)(f) (stating that the BLM shall consult with "Tribal Governments, tribal groups, and interested persons within the tribal communities"); Section D(12)(c) (stating that the BLM shall consult with "Tribal Governments"). In contrast, defendants argue that Section D(3), which they admit includes Carlin as a "Consulting Party," specifically limits Carlin's consultation rights to the time immediately following Carlin's completion of Class III inventories in 2013 and terminated shortly after. See ECF No. 106, Ex. 1, Section D(3) (stating that "[t]he BLM, in consultation with the SHPO, Tribal Governments, and other Consulting Parties shall evaluate all Cultural Resources (including TCPs) identified within the applicable APEs for Eligibility to the [National Register] (utilizing criteria found in 36 CFR 60.4 ) as inventories and revisits are completed."). Thus, defendants contend that because the ongoing consultation provisions of the project PA (which defendants narrowly limit to Sections D(2)(f) and D(12)(c)) only mention Tribal parties of which Carlin is not a member, Carlin has no right under the project PA to challenge the BLM's April 2016 decision or to complain that it was not consulted during the process.
However, defendants' argument is not supported by any reasonable reading of the project PA. First, the court notes that the term "Consulting Party" is specifically defined in the project PA as "[o]rganizations or individuals likely to be interested in the Project and who have requested that they be consulted about Cultural Resources that would be affected by the Project." ECF No. 106, Ex. 1, Appendix A: Definitions. It is undisputed that Carlin is an organization likely to be interested in the mining project, given that they are the Operator of the project as that term is defined in the PA.[13] Further, it is undisputed that Carlin, as a signatory to the PA, requested to be consulted about decisions, including those related to "Cultural Resources" that could affect the project. Moreover, defendants recognize that Carlin is a "Consulting Party" for Section D(3) of the project PA which specifically uses *1237 that term. See id. , Section D(3) (utilizing the "Consulting Party" language to identify parties with consultation rights). Therefore, the court finds that Carlin is a "Consulting Party" as defined in the project PA and is appropriately considered a "Consulting Party" when that term is used in the project PA.
Accepting that Carlin is a "Consulting Party" on the PA, defendants' argument that Carlin is not entitled to ongoing consultation rights is nonsensical. Defendants do not explain, and the court cannot reconcile, why Carlin can be a "Consulting Party" under Section D(3), but not a "Consulting Party" under Section D(12)(c), when both sections use the same language. Compare id. , Section D(3) ("The BLM, in consultation with ... other Consulting Parties) with Section D(12)(f) ("Consultation with Consulting Parties"). Such a narrow interpretation of the project PA, which excludes Carlin from Section D(12)(c), is contrary to accepted principles concerning the interpretation of contracts. See Flores v. Am. Seafoods Co. , 335 F.3d 904, 910 (9th Cir. 2003) (holding that a written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations).
Second, neither Section D(2)(f) nor Section D(12)(c) expressly governs consultation on National Register eligibility determinations and thus, do not support defendants' argument. Section D(12)(c), which is in the section of the project PA entitled Time Frames, governs ongoing consultation for the "determination and implementation of treatment plans" to protect cultural resources discovered during the project. See ECF No. 106, Ex. 1, Section D(12)(c). There is no mention of consultation on eligibility determinations anywhere in this section. Similarly, Section D(2)(f) involves ongoing consultation with tribes on the identification of TCPs. Identification of TCPs is a legally distinct process from eligibility determinations and only an Indian Tribe has the authority to identify its own TCPs. See Navajo Nation , 479 F.3d at 1029. However, the mere identification of a TCP by a tribe does not automatically make it eligible for inclusion on the National Register. Instead, eligibility determinations are made by a special process conducted by the relevant agency, in this case the BLM, pursuant to statutory guidelines. See 36 C.F.R. § 60.4. Thus, it makes sense that Carlin is not a consulting party to the Band's TCP designations as it has no authority to either identify the Band's traditional cultural property or challenge the Band's identification of its own TCPs. And, in contrast to Sections D(3) and D(12)(c), the term "Consulting Party" is not found in Section D(2)(f).
The only contract provision identified by the BLM that mentions eligibility determinations is Section D(3) which defendants concede includes Carlin as a consulting party. See ECF No. 106, Ex. 1, Section D(3) ("The BLM, in consultation with ... other Consulting Parties shall evaluate all Cultural Properties (including TCPs) ... for eligibility to the [National Register] ... as inventories and revisits are completed."). Defendants argue that Carlin's consultation rights under Section D(3) were limited to immediately after Carlin completed the cultural inventories during project approval and did not continue past project approval. However, the plain language of Section D(3) is not so limited. Rather, the plain language provides that "Consulting Parties" shall be consulted on eligibility determinations "as inventories and revisits are completed." Id. The PA does not define what constitutes a "revisit" to the project area and the term is not mentioned elsewhere in the PA. The word "revisit" can be either a verb, meaning "to consider or discuss again," or it can be *1238 used as a noun, meaning "a second or repeated consideration or discussion of a subject." American Heritage Dictionary of the English Language (Fifth Ed. 2016). As used in Section D(3), the word revisit can reasonably be interpreted to be a noun and the court finds that, based on its use and the purpose of Section D(3), the term revisit should be understood to mean "second or repeated consideration or discussion of a subject." As this case concerns the subsequent designation of TCPs in and around the project area after Carlin's inventory, a reasonable reading of the revisit language would include consideration of eligibility determinations on TCPs after the completion of Class III inventories because such determinations are repeated considerations or discussions of the same underlying issue: whether TCPs identified by the Battle Mountain Band are eligible for inclusion on the National Register. It would be incongruous to allow the Band to continue to identify TCPs on project land after the BLM issues its ROD and seek to have those TCPs included on the National Register but preclude Carlin from having any consultation rights on eligibility determinations on those TCPs simply because a ROD had already been issued, especially when such an eligibility determination can have a significant impact on Carlin's ability to conduct mining operations under the project. The court shall not so narrowly construe the project PA.
Additionally, several other provisions of the project PA, which were not identified or relied upon by defendants in their briefing, support the court's interpretation that Carlin is entitled to ongoing consultation rights on subsequent eligibility determinations for the duration of the project. For example, both Sections D(3)(a) and (b) specifically require the BLM to consult with "Consulting Parties" on all determinations of whether certain TCPs may be eligible for inclusion on the National Register. See ECF No. 106, Ex. 1, Section D(3)(a) ("The BLM shall require the Contractor conducting the Class III inventory to make initial recommendations regarding Eligibility, but determinations of Eligibility will be made by the BLM in consultation with the SHPO, taking into consideration the views of the Consulting Parties."); Section D(3)(b) ("The BLM shall apply the NRHP criteria to properties proposed as TCPs in consultation with Tribal Governments and other Consulting Parties, and with the SHPO's concurrence determine whether such properties are eligible."). Further, several provisions in Section D(4), which governs the procedures the BLM must follow when historic or cultural properties (including TCPs) are identified on project land, require consultation with Carlin. In particular, Sections D(4)(a)(3), D(4)(a)(4), D(4)(b), and D(4)(c) all use the "Consulting Party" language when discussing the BLM's consultation duties. See, e.g. , ECF No. 106, Ex. 1, Section D(4)(b) ("Avoidance. The BLM, in consultation with ... Consulting Parties ... shall ensure that Operator avoids Adverse Effects to Historic Properties through project design or redesigning[.]"). And, nowhere in these provisions is consultation limited or restricted to the time period immediately following the completion of Class III inventories.
Finally, the court's interpretation of the PA is supported by defendant Silvey's own written interpretation of the BLM's ongoing consultation duties under the project PA. On November 20, 2015, after the Battle Mountain Band had initiated the dispute resolution process against the BLM, defendant Silvey authored a letter to Director Nelson, the director of the Advisory Council on Historic Preservation, in response to the Band's initial identification of new TCPs. See ECF No. 112, Ex. 1. In that letter, Silvey stated that the BLM "will consult with the Band, as well as the operator, Carlin Resources, on the eligibility *1239 of the new TCP values prior to making determinations of eligibility" as to whether the Battle Mountain Band's newly identified TCPs could be included on the National Register. Id. Further, Silvey stated that the BLM "will consult with Carlin Resources because BLM's determinations may affect their interest in the area, as well as the fact that Carlin signed the PA as an invited signatory." Id.
Although the court recognizes that Silvey does not identify any specific provision of the project PA in her letter, she does provide her official opinion about the BLM's consultation duties for ongoing eligibility determinations and specifically notes Carlin's interest in new eligibility determinations. Further, the letter reflects Silvey's official understanding of how the BLM should proceed under the project PA when new eligibility determinations need to be made. A reasonable person could interpret Silvey's statements as promising that Carlin would be part of the consultation process. Therefore, based on the above, the court finds that defendants' alleged failure to consult with Carlin prior to the BLM's April 2016 decision is sufficient to allege an "injury in fact" for purposes of constitutional standing.
Defendants make an additional argument that even if Carlin had a right to consultation under the project PA, Carlin has not suffered any concrete harm. In particular, defendants argue that because the BLM's April 2016 decision has not had any effect on Carlin's ability to proceed on the project as Carlin was able to construct the power line which was the focus of the Battle Mountain Band's motion for a preliminary injunction (ECF No. 27) and thus, Carlin has not been affected by the BLM's decision. The court finds this argument disingenuous. Carlin had to intervene in this action and spend significant resources to litigate the Band's motion and protect its rights in the mining project against both defendants and the Band. Thus, the BLM's decision had a direct impact on Carlin. Further, it is a foundational principle of contract law that when a binding agreement is breached, the non-breaching party has suffered an injury and may seek judicial remedy. See United States v. Winstar Corp. , 518 U.S. 839, 885 n.30, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (citing Restatement (Second) of Contracts § 346, Comment a (1981)). Moreover, it is not necessary that Carlin show that the alleged procedural injury caused it economic harm. It is sufficient for a plaintiff alleging a procedural injury to show that they have a procedural right that may potentially protect their interests. Salmon Spawning & Recovery All. v. Gutierrez , 545 F.3d 1220, 1226 (9th Cir. 2008) (emphasis added). Nor is it necessary for Carlin to show that participation and consultation in the eligibility determination would have actually changed the outcome of the BLM's April 2016 decision. See Lujan , 504 U.S. at 572-73, 112 S.Ct. 2130 (finding that it is not necessary for a plaintiff to prove that the actual outcome of an agency decision would have changed if the agency had followed the alleged proper procedures). Therefore, the court finds that Carlin has constitutional standing to bring its cross-claims. Accordingly, defendants' motion to dismiss shall be denied on this issue.
B. Prudential Standing
Defendants also assert in their motion to dismiss that Carlin lacks prudential standing to make a claim under the NHPA. See ECF No. 103. Specifically, defendants contend that Carlin's interests do not fall within the zone of interests protected by the NHPA because Carlin's interests in this action are wholly economic and the NHPA does not protect wholly economic interests.
*1240 The test for prudential standing "is not meant to be especially demanding" and there need not be any indication that a federal statute's purpose is "to benefit the would-be plaintiff." Clarke v. Sec. Indus. Ass'n , 479 U.S. 388, 399-400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Rather, the burden of establishing prudential standing is very low, and "a court should deny standing under the 'zone of interest' test only if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably be assumed that Congress intended to permit the suit." City of Sausalito v. O'Neill , 386 F.3d 1186, 1200 (9th Cir. 2004). In fact, the "zone of interests" should only be applied "to exclude those plaintiffs whose suits are more likely to frustrate than further statutory objectives." Clarke , 479 U.S. at 397 n. 12, 107 S.Ct. 750. For parties that seek relief and review of agency action under the APA, the party "need only show that their interests fall within the 'general policy' of the underlying statute, such that interpretations of the statute's provisions or scope could directly affect them." Id.
Here, the court finds that Carlin has prudential standing to pursue its cross-claims because its interests, while partially economic in nature as it seeks to open a fully functional and operational mine, fall within the underlying purpose of the NHPA. The express purpose of the NHPA is to "foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations[.]" 54 U.S.C. § 300101. Carlin's mining project, approved under the requirements of the NHPA, is part of that purpose. Further, it is undisputed that Carlin and the BLM entered into the project PA in order to comply with their various obligations under Section 106 of the NHPA. Where an agency or a party violates a provision of an agreement substituting for Section 106, like the project PA in this case, the violation of the agreement can constitute a violation of the NHPA. See Muckleshoot Indian Tribe v. United States Forest Serv. , 177 F.3d 800, 807 (9th Cir. 1999) (citing Pueblo of Sandia v. U.S. , 50 F.3d 856, 860-61 (10th Cir. 1995) ). Moreover, Carlin's cross-claims allege that the BLM's decision interferes with Carlin's contractual rights under the project PA, and thereby, the substantive rights of the NHPA which requires an agency involve "consulting parties ... in findings and determinations made during the section 106 process." 36 C.F.R. § 800.2(a)(4). Thus, the rights Carlin seeks to have vindicated in this action are rights granted under the NHPA. Therefore, the court finds that Carlin has prudential standing to bring its various cross-claims and the court shall deny defendants' motion accordingly.
IT IS THEREFORE ORDERED that defendants' motion to dismiss cross-claims (ECF No. 103) is DENIED in accordance with this order.
IT IS SO ORDERED.

For a more in-depth history of this action, see the court's order on plaintiff's motion for a preliminary injunction. ECF No. 78.

The Tosawihi Quarries are the largest opalite quarry in the Great Basin and are approximately 3,700 acres in size. Previous historical and anthropological research conducted at the quarries indicates that they have been utilized by indigenous people for at least 10,000 years. The Tosawihi Quarries are located within a naturally designated historical and archaeological district known as the Tosawihi Quarries Archaeological District. Portions of the quarries have been open to various mining activities for over 100 years.

Plaintiff is one of four bands that comprise and make up the Te-Moak Tribe of Western Shoshone Indians, a federally recognized Indian tribe. The Band currently resides on colony land in close proximity to the Tosawihi Quarries.

A "traditional cultural property" is one associated with "cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." Navajo Nation v. U.S. Forest Serv. , 479 F.3d 1024, 1029 (9th Cir. 2007). If a particular location is identified by an Indian tribe as a traditional cultural property, then that land is treated as a TCP by the BLM for purposes of the National Historic Preservation Act. Designation as a TCP is based on an Indian tribe's historical connection to a particular location and only requires the tribe claim an area as a TCP.

Relevant to this action, the BLM is the appropriate agency to make TCP eligibility determinations related to the Tosawihi Quarries. Eligibility for the National Register is determined by federal laws and regulations governing historical properties. To be considered eligible for the National Register, a particular location must meet several criteria identified at 36 C.F.R. § 60.4 which require substantial evidence of historical use. Thus, not all identified TCPs are automatically eligible for inclusion on the National Register.

As described in Mont. Wilderness Ass'n v. Connell , 725 F.3d 988, 1005-06 (9th Cir. 2013), three different classes of cultural and environmental surveys are recognized under the NHPA. A Class III survey is the highest survey level and the most in-depth survey conducted on a project. Id. In particular, a Class III survey is an "intensive survey that involves a professionally conducted, thorough pedestrian survey of an entire target area ... intended to locate and record all historic properties and that provides managers and cultural resource specialists with a complete record of cultural properties." Id. If a Class III survey is conducted on a project, it is presumed that the federal agency complied with the requirements of Section 106 of the NHPA.

After the completion of the initial Class III inventory, the BLM found that twenty of the Band's identified TCPs were eligible for inclusion on the National Register. Then, in 2013, a second Class III survey was conducted on the project in accordance with Section 106 of NHPA. As a result of that survey, and additional information of historic use provided by the Band, additional TCPs within the Tosawihi Quarries were deemed eligible for inclusion in the National Register.

As outlined in 34 C.F.R. § 800.14, the ACHP, the BLM, and other relevant parties "may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" on historic lands. A programmatic agreement constitutes the governing document for a particular project as it relates to determining and dealing with the environmental impacts of a project on historical land, and it supersedes certain federal regulations. See 36 C.F.R. §§ 800.13 -14. Programmatic agreements are particularly useful "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. § 800.14(b)(1)(ii). A copy of the project PA is included as Exhibit 1 to the BLM's notice of corrected document. See ECF No. 106, Ex. 1.

In its motion, the BLM does not challenge the other two factors for constitutional standing. However, as these factors are relevant to the court's exercise of subject matter jurisdiction over this action, the court must sua sponte address these two factors. Reviewing the relevant documents, the court finds that Carlin has made a sufficient showing that there is a causal connection between the alleged injury and the BLM's conduct and that the court could provide redress for the alleged injury to meet these factors. First, there is a clear causal connection between defendants' failure to consult with Carlin and Carlin's alleged injury of a violation of the project PA. Second, Carlin has established that a favorable judgment from the court is both within the court's power and would redress Carlin's alleged injury.

Section D(12)(c) of the project PA states in its entirety: "Consultation with Consulting Parties. The BLM shall consult with Tribal Governments, concurrently with SHPO consultation, about TCPs, Historic Properties, and other concerns potentially affected by the Project. Consultation with Tribal Governments shall be on-going. Additional consultation will take place during Section 106 evaluation, regarding specific alternatives in the Project EIS, as part of monitoring and discovery situations, and for development and implementation of treatment plans. Tribes shall have 30 calendar days from receipt to review and comment on any documentation. The BLM shall provide Signatories with copies of any comments received during Tribal Consultation with the exception of sensitive or confidential information obtained from Tribal Consultation. The SHPO shall have 10 working days to review the comments." ECF No. 106, Ex. 1, Section D(12)(c).

Section D(2)(f) of the project PA states in its entirety: "The BLM shall consult with BLM-identified Tribal Governments, tribal groups, and interested persons within the tribal communities of interest to identify [TCPs] or properties of traditional religious and cultural significance." ECF No. 106, Ex. 1, Section D(2)(f).

Section D(3) of the project PA states in relevant part: "Evaluation. The BLM, in consultation with the SHPO, Tribal Governments, and other Consulting Parties shall evaluate all Cultural Resources (including TCPs) identified within the applicable APEs for Eligibility to the [National Register] (utilizing criteria found in 36 CFR 60.4 ) as inventories and revisits are completed." ECF No. 106, Ex. 1, Section D(3).

The term "Operator" is also specifically defined in the project PA as "a person conducting or proposing to conduct operations," and the parties agree that Carlin is the Operator of the project. ECF No. 106, Ex. 1, Appendix A: Definitions.